UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Trenton Vicinage

| | |
|---|---|
| **Dorothy M. Thompson, Barry Seward,** and **Trude Sherrod-Polan** *on behalf of themselves and all others similarly situated*,<br><br>    Plaintiffs,<br><br>    v.<br><br>**Constance Ludden,** in her official capacity as tax collector for the City of Trenton; **the City of Trenton**, a New Jersey political subdivision unit of government; **Rachel Hundley**, in her official capacity as clerk of the tax collection department for the Township of Hazlet; the **Township of Hazlet**, a New Jersey political subdivision unit of government; **Susan E. McCloskey**, in her official capacity as tax collector for the Township of Lawrence; and the **Township of Lawrence**, a New Jersey political subdivision unit of government; *on behalf of themselves and all others similarly situated*, and **Marita R. Sciarrotta**, acting director of the State of New Jersey Division of Taxation,<br><br>    Defendants. | Case Number: 3:24-cv-6295<br><br>**CLASS ACTION COMPLAINT** |

1

## CLASS ACTION COMPLAINT

1.     The Fifth Amendment to the U.S. Constitution, incorporated against the States through the Fourteenth Amendment, prohibits the government from taking private property without paying just compensation to the property's owner.

2.     For decades, the municipalities of New Jersey have violated this prohibition.

3.     The violation proceeds as follows. First, the municipalities automatically secure property taxes at assessment by placement of a lien. Next, the municipalities take the liens on properties of people who owe back taxes—often, only a few thousand dollars—and sell them as tax sale certificates. The buyer—or the municipality if it retained the certificate—can then foreclose on the property, receiving title in fee simple to the property. Neither the certificate buyer nor the municipality, however, returns to the original owner the surplus value over-and-above the back taxes; instead, the buyer (or municipality) keeps that surplus value for themselves.

4.     The U.S. Supreme Court recently held, unanimously, that this practice of retaining surplus value in connection with property taken to satisfy a tax lien violates the Fifth Amendment's Takings Clause. *Tyler v. Hennepin County*, 598 U.S. 631 (2023).

5.     The victims of this state policy are spread across New Jersey's municipalities. They are most often poor, elderly, and vulnerable. Stealing surplus value from these individuals is not just unconstitutional, it is unconscionable.

6.     This lawsuit seeks redress for these unconstitutional, uncompensated takings. More precisely, this suit seeks relief on behalf of a class of all victims of the counties' property value theft. And it seeks this relief against a defendant class consisting of every New Jersey municipality.

7.     The class-action mechanism provides a clean, efficient vehicle for judicial resolution of the thousands of individual claims that would otherwise clog the courts.

8.     It is time to end the practice of institutionalized property-value theft and to justly compensate thousands of New Jerseyans who were victims of this practice.

## PARTIES – PLAINTIFFS

9.     Plaintiff Dorothy M. Thompson is a natural person resident in San Juan, Puerto Rico, who formerly owned a property in Trenton, New Jersey.

10.     Plaintiff Bruce Seward is a natural person resident in Freehold, New Jersey, who formerly owned a property in Hazlet, New Jersey.

11.     Trude Sherrod-Polan is a resident person in Lawrence, New Jersey, who formerly owned a property in Lawrence, New Jersey.

12.    Plaintiffs, and all others similarly situated, were victims of institution-alized theft by their county government thanks to New Jersey's property tax stat-utes.

### PARTIES – DEFENDANTS

13.    Constance Ludden is tax collection officer of the City of Trenton. She is also the city's assessor. She is responsible for administering the property tax statutes for Trenton. *See* N.J. Stat. Ann. § 54:5-19. She is sued in her official capacity as an agent of the City of Trenton.

14.    The City of Trenton is the municipal government for a municipality in New Jersey. It is the employer of Ms. Ludden, who administer its tax scheme. It is home to the state capitol.

15.    Rachel Hundley is the clerk of the tax collector department for the Town of Hazlet. She is responsible for administering the property tax statutes for Hazlet. *See* N.J. Stat. Ann. § 54:5-19. She is sued in her official capacity as an agent of the Township of Hazlet.

16.    The Township of Hazlet is the municipal government for a municipal-ity in New Jersey. It is the employer of Ms. Hundley, who administers its tax scheme.

17.    Susan E. McCloskey is the municipal tax collector for the Township of Lawrence. She is responsible for administering the property tax statutes for

Lawrence. *See* N.J. Stat. Ann. § 54:5-19. She is sued in her official capacity as an agent of the Township of Lawrence.

18.    The Township of Lawrence is the municipal government for a municipality in New Jersey. It is the employer of Ms. McCloskey, who administers its tax scheme.

19.    Acting under color of state law and pursuant to policies implementing the New Jersey Tax Sale Law (TSL), N.J.S.A. §§ 54:5-1 to -137, the Defendants violated the rights of Plaintiffs and all others similarly situated (the plaintiff class) by stealing the value in their property over and above the amounts legally owed for back property taxes.

20.    Marita R. Sciarrotta was sworn in as Acting Director of the New Jersey Division of Taxation on September 25, 2023.

21.    According to its website, the Division of Taxation "provide[s] advice and oversight regarding consistent property tax administration and valuation policies and practices to achieve uniform compliance and equitable treatment of taxpayer for the local property tax monies used to support schools and county and municipal governments."

22.    According to its website, the Division of Taxation has "the primary responsibilities of analyzing annual real estate sales activities, monitoring assessor and county boards of taxation for compliance with statutory mandates and other matters."

## JURISDICTION & VENUE

23.    Jurisdiction exists under 28 U.S.C. § 1331 because the Plaintiffs and the proposed Plaintiff Class are individual persons (and their estates and heirs) and entities (such as limited liability companies or corporations) bringing claims under the U.S. Constitution for violations of their civil rights by a local government. See 42 U.S.C. § 1983.

24.    Jurisdiction for the declaratory relief is further appropriate under 28 U.S.C. § 2201(a).

25.    Jurisdiction over the pendent or supplemental state law claims is appropriate under 28 U.S.C. § 1367.

26.    Venue is appropriate in the District of New Jersey under 28 U.S.C. §1391(b)(1) & (2) because the real properties at issue are located in the District of New Jersey, the majority of members of the Plaintiff Class are likely in the District of New Jersey, and the named Defendant municipalities and their officials are in the District of New Jersey.

## FACTS

27.    For decades, New Jersey law has commercialized the collection of unpaid property taxes. N.J. Stat. Ann. §§ 54:5-1 to -137. New Jersey law secures property taxes by a lien on the property at the time of assessment. The Tax Sale Law permits municipalities, which collect those property taxes and other charges, to sell unpaid tax liens to third-party investors or to keep the liens for themselves as tax

sale certificates. Either way, the municipality or the tax-lien holder can charge high rates of interest through a redemption period, during which the property owner can pay the back taxes with fees and interest. If the property owner fails to do so, the lien-holder (whether the municipality, the State or county, or a private investor) can file for a tax foreclosure on the property.

28.    This process works a taking in violation of the Fifth Amendment. The municipal government authorizes the taking when it sells the tax certificate, which includes the right to foreclose on the property. If the property owner does not pay off the tax debt in time and a foreclosure occurs, the taking is implemented and the home owner's constitutional claim accrues.

29.    The process starts when the municipal tax officer, such as Ms. Ludden, issues a tax sale certificate. *See* N.J. Stat. Ann. § 54:5-19 (explaining that the municipality may "enforce the lien by selling the property"); *id.* §§ 54:5-5 to -50. After a redemption period, the certificate holder can foreclose on the property. *Id.* §§ 54:5-86, -87; *see id.* §§ 54:5-104.32, 32a. The forecloser can either keep the property or sell it; either way, any value over and above the back taxes goes to the forecloser, not the original property owner. *See 257-261 20th Ave. Realty, LLC v. Roberto*, 307 A.3d 19, 32 (N.J. App. Div. 2023). This transfer of the property in fee simple without returning excess value to the original owner is a taking of that excess value.

30.     In cases where no one buys the tax lien certificate, the municipality itself retains the lien and exercises the right to foreclose and retains the surplus value.

31.     This is what happened to Dorothy Thompson. Mrs. Thompson and her late husband formerly owned a property at 233 Highland Avenue, Trenton, New Jersey. A tax sale certificate had been issued in 2014. By January 2023, when the certificate holder foreclosed on the property, Mrs. Thompson owed $7,826.84. (The foreclosure was recorded on March 8, 2023.) Yet the fair market value of the property was $105,600.[1] When the property was foreclosed, Mrs. Thompson lost almost $100,000 in surplus value.

32.     That is also what happened to Barry Seward. Mr. Seward formerly owned a property at 53 Franklin Ave., Hazlet, New Jersey. Tax sale certificates were issued on the property in 2008 and 2011. The unpaid taxes were under $2,000. With interest, the total value of back taxes owed at the time of foreclosure was $14,491.72. The property sold shortly after foreclosure for $145,000. Thus, when the property was foreclosed, Mr. Seward lost almost $130,000.

33.     Trude Sherrod-Polan can tell a similar story. She owned a small home, 901 feet, at 84 Lewisville Road in Lawrence Township, New Jersey. Tax sale certificates were issued on a tax debt of $27,167.23. The property, according to Zillow,

---

[1] According to Realtor.com.

is currently worth $289,100, which means Ms. Sherrod-Polan lost well over $200,000.

34.    The stories of Mrs. Thompson, Mr. Seward, and Mrs. Sherrod-Polan illustrate the harsh reality of New Jersey's property tax system. For decades, the State and its municipalities have conspired to knowingly, unconstitutionally, and immorally steal value, often a lifetime of savings, from homeowners and small businesses in order to boost their own bank accounts.

35.    These were not one-off events but are typical of a systematic, institutionalized, multi-decade practice and policy undertaken pursuant to state law to profit from property owners beyond the taxes and fees justly due.

36.    Municipalities make more money than they otherwise would from collecting taxes when they sell these liens (tax sale certificates). That is because purchasers know New Jersey law entitles them to keep the surplus over and above the back taxes in the event they foreclose on the property. The tax sale certificates are worth more at auction because the third-party investor receives a conditional right to the surplus value in the event that, as often happens and as happened to plaintiffs here, the taxpayer is unable to pay the redemption amount within the designated time period.

37.    The theft of surplus value is only possible when the government authorizes it through a tax sale certificate pursuant to New Jersey law.

38.     Private entities are not authorized to steal excess value in a standard foreclosure outside the Tax Sale Law. For instance, when a bank forecloses on a property after a debtor defaults on a mortgage, the bank may take the property but it must return any surplus equity in the property above the mortgage to the borrower. *See Morsemere Fed. Sav. & Loan Ass'n v. Nicolaou*, 503 A.2d 392, 395-96 (N.J. App. Div. 1986).

39.     Foreclosures based on tax liens are the only foreclosures in New Jersey where property owners lose everything regardless of the size of their debt. When a municipality (or a private party that purchases the tax sale certificate) forecloses on a property, New Jersey law permits it to keep the surplus equity.

40.     Even in this context, most states require the government to return the surplus value to the owner; New Jersey is in the small minority of states that institutionalizes the theft of surplus value.

41.     In the wake of the Supreme Court's decision in *Tyler*, the Defendant Class should have moved to refund the surplus value that the counties stole from the Plaintiff Class; upon information and belief, none has done so, thus continuing to violate the rights of Plaintiffs and countless other class members.

## NEW JERSEY JUDICIARY
## WORKING GROUP REPORT

42.     In the wake of *Tyler*, the New Jersey Supreme Court's Chief Justice formed a working group of state officials and stakeholders to review the decision's

impact, led by the state court's administrative director. The working group consisted of 19 members—attorneys who practice in this area, staffers from legislative leadership offices, and representatives of local government, among others.

43.    In February 2024, the Working Group issued its report.

44.    The report begins, "The United States Supreme Court in *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 143 S. Ct. 1369 (2023), held that local government's retention of the excess value of the home above the plaintiff's tax debt in a tax foreclosure was plausibly alleged as a violation of the Takings Clause of the U.S. Constitution. Like the Minnesota process, New Jersey statutes (N.J.S.A. 54:5-86 et seq.) and Court Rules permit a municipality or a private investor to obtain title to a property subject to unpaid taxes without a public sale and without any process for the property owner to retain the surplus equity beyond the amount of unpaid taxes."

45.    The report continues later on, "in these foreclosures there is no sheriff's sale and no opportunity for the property owner to recoup any portion of their surplus equity before title to the property vests in the municipality or the private lienholder who secured the tax sale certificate. When the lien holder obtains title in a tax foreclosure, the final judgment also extinguishes the interests of any mortgagee (or other lien holders) in the property."

46.    The report continues, "Each year, more than 1,000 properties in New Jersey proceed through tax sale foreclosure. Many property owners lose significant

surplus equity since absent redemption there is no way in the current law to protect such equity. Like the homeowner in *Tyler*, New Jersey property owners who owed modest tax debts lose their surplus equity since the New Jersey Tax Sale Law provides no method to preserve their surplus equity."

47.     The report continues, "Municipalities often encourage investment in tax sale properties to help return properties to productive tax rolls, and to maintain lower property tax rates for all residents; and such municipalities also work to enable residents to remain in their homes when feasible."

48.     The report continues, "Historically, investors have had an interest in gaining equity from the foreclosed property, and may be disincentivized to invest in areas of the State where property values are low unless there is the potential to obtain certain properties without the expense of public sales."

49.     The report notes, "The current timeframe to file for property tax foreclosure is 20 years, except there is no limitations period if the tax sale certificate is held by a municipality."

50.     Subsequent to the Working Group report, in March 2024, the deputy speaker of the New Jersey Assembly introduced a bill to, in the words of the title, "[r]evise[] tax lien foreclosure process to protect equity accrued by property owner in tax lien foreclosure." Assembly Bill 3968 (2024-25). As of the date of the complaint, the bill has not been scheduled for any legislative action.

51.    The legislative findings at the beginning of the bill note that *Tyler* "has very important implications for the rights of all property owners, and specifically, New Jersey law governing property taxes on real property."

52.    The findings continue, "The taking of the entirety of a property owner's equity in a parcel of real estate because that property owner was delinquent in the payment of property taxes attributable to the parcel of real property would appear to violate Article I, paragraph 20 of New Jersey's Constitution as well as the Fifth Amendment of the United States Constitution based on the reasoning set forth in *Tyler v. Hennepin County, Minnesota, et. al.*"

## PLAINTIFF CLASS

53.    A class action is the simple, efficient way to ensure that all New Jersey homeowners and small businesses that have been victims of this unconstitutional and unlawful taking receive the just compensation to which they are entitled.

54.    To that end, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Class:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in the state of New Jersey; (2) their property was subject to a tax sale certificate foreclosure under the New Jersey Tax Sale Law, N.J. Stat. Ann. §§ 54:5-1 to -137; (3) the fair market value of the property at the time of the foreclosure and/or the price for which their property was sold exceeded the back taxes and interest owed at the time of the foreclosure.

55.    In the alternative, Mrs. Thompson also brings this action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23, particularly Rule 23(a) and (b), on behalf of the following Subclass:

> All persons, natural and legal, and their successors and heirs, who meet the following criteria: (1) they owned or were the beneficial owners of real property in Trenton in the state of New Jersey; (2) their property was subject to a tax sale certificate foreclosure under the New Jersey Tax Sale Law, N.J. Stat. Ann. §§ 54:5-1 to -137; (3) the fair market value of the property at the time of the foreclosure and/or the price for which their property was sold exceeded the back taxes and interest owed at the time of the foreclosure.

56.    Excluded from the Class and Subclass are: (i) any judge or magistrate presiding over this case and their family members and staff; and (ii) Plaintiffs' counsel. Plaintiffs reserve the right to modify the class definition as the case unfolds and further facts are discovered.

57.    Upon information and belief, the Plaintiff Class and Subclass include thousands of people and companies whose homes or business properties were taken through a tax deed. Bringing such suits individually would clog New Jersey courts, whereas a single plaintiff-class would result in an efficient adjudication, such that the requirement of numerosity is met. The information as to who belongs to the class can be discerned from data held by the Defendant Class members. Moreover, the present addresses of members of the Plaintiff Class and Subclass can be ascertained from public records, and members of the Plaintiff Class and Subclass can be reached by multiple methods of communication.

58.     There are questions of law and fact common to all members of the Plaintiff Class and Subclass. All have been subject to the same process laid out by New Jersey's Tax Sale Law and executed by all municipalities pursuant to these statutes.

59.     The questions of law are common across the Class and Subclass:

- Does the Defendants' policy of foreclosure without returning surplus value to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

- Did the Defendants commit the tort of inverse condemnation by taking the property of Plaintiff without an eminent domain proceeding and without just compensation?

- Did the Defendants commit the tort of conversion by taking the specific money to which Plaintiff have an absolute and immediate right?

- Did the Defendants commit the tort of unjust enrichment by retaining the benefit of the money or property of Plaintiff?

- Did the Defendants commit the tort of money had and received by retaining the money or property of Plaintiff?

- Does the Defendants' policy of selling property via a tax sale certificate and permitted foreclosure without returning surplus value to the property owner constitute a taking without just compensation under the New Jersey Constitution?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the New Jersey Constitution?

60.     The questions of fact are also simple: Were the Plaintiff Class and Sub-class members stripped of their property by municipal action? And did the fair market value of the property, as determined by a neutral third-party data provider, assessed value, or actual sale price exceed the back taxes and interest owed on the property?

61.     Once the law and facts are resolved, the question is simply how to return to the Plaintiff Class and Subclass the amount unlawfully taken from them by the Defendant Class of municipalities.

62.     The fair market value of each property can fairly be determined from commercially available data, or municipal tax assessments. The fair market value of each property can be calculated in a way that is simple, straightforward, and universally applicable to the entire Plaintiff Class and Subclass. *See United States v. 50 Acres of Land*, 469 U.S. 24, 25-26 (1986); *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (fair market value is the appropriate standard to determine just compensation for a taking).

63.     The homeowner's excess value can also be easily calculated based on the price for which the property was ultimately sold. At a minimum, homeowners are legally entitled to all amounts collected from an actual sale that exceed the amount of back taxes the homeowner owes.

64.    The claims are typical across the entire class: all members of the Plaintiff Class and Subclass were the victims of the same property tax statutes administered by the municipalities pursuant to state law.

65.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclass. Plaintiff is a member of the Class and Subclass. Plaintiff has no interests adverse to the interests of the Class and Subclass. Plaintiff is committed to prosecuting this action and has retained competent, experienced counsel who have had substantial success prosecuting class action cases and claims based on constitutional law.

66.    Questions of law or fact common to the Plaintiff Class and Subclass predominate over questions affecting individual members of the class, as the only individualized question—the size of the surplus taken from any given class member—can be quickly and easily determined using commercially available data.

67.    Similarly, the Defendant Class's actions apply generally to the whole Plaintiff Class, so final declaratory and damages relief is appropriate and indeed necessary to rectify the wrongs the municipalities have perpetrated on the class.

68.    A class action is the optimal vehicle to fairly and efficiently resolve the question of property value theft for its victims statewide. The alternative is thousands of individual lawsuits, which would clog the courts. Moreover, such lawsuits are unlikely to the extent that the Plaintiff Class and Subclass is overwhelmingly composed of low-income residents, elderly residents, and residents for whom

English is a second language. A class action ensures all victims of property theft are justly compensated without burdening the courts or Defendant units of government with numerous lawsuits.

## DEFENDANT CLASS

69.    It is further appropriate to certify a defendant class action. Defendant classes are most often used and most appropriate in cases against governmental units—as in this case, where all municipalities acted in accord with the same state statutory scheme.

70.    To that end, Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, against the following class:

> All New Jersey municipalities and their tax collection officers who executed or aided in the execution of tax sale certificate foreclosures on properties where the fair market value of the property exceeded the amount of back taxes and interest owed on the property at the time of the foreclosure.

71.    All New Jersey municipal governments are political subdivisions of the State subject to the Fifth Amendment to the U.S. Constitution via the Fourteenth Amendment. They are all also "persons" subject to 42 U.S.C. Section 1983, the civil rights statute.

72.    All New Jersey municipal governments and their responsible officers (the tax collection officers) acted uniformly in the relevant respects in their administration of the Tax Sale Law.

73.    There are 564 New Jersey municipalities. Bringing all of them into an action with separate counsel would be utterly impractical and make case administration impossible. Resolving these claims through class-actions against individual municipalities could also create 564 separate cases and could create conflicting or differing resolutions, resulting in unfairness between county residents.

74.    Common questions of law and fact exist as to all counties: all counties acted pursuant to the same state statutes.

75.    The questions of law are common across the class:

- Does the Defendants' policy of foreclosure without returning surplus value to the property owner constitute a taking without just compensation under the Fifth Amendment?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the Eighth Amendment?

- Did the Defendants commit the tort of inverse condemnation by taking the property of Plaintiffs without an eminent-domain proceeding and without just compensation?

- Did the Defendants commit the tort of conversion by taking the specific money to which Plaintiffs have an absolute and immediate right?

- Did the Defendants commit the tort of unjust enrichment by retaining the benefit of the money or property of Plaintiffs?

- Did the Defendants commit the tort of money had and received by retaining the money or property of Plaintiffs?

- Does the Defendants' policy of selling property via a tax sale certificate and permitted foreclosure without returning surplus value to the property owner constitute a taking without just compensation under the New Jersey Constitution?

- Does the Defendants' policy of imposing punitive sanctions in the form of seized surplus value far in excess of the back taxes owed violate the New Jersey Constitution?

76.    After a legal conclusion in this case is reached, each municipality can be contacted through its responsible officials to access the data necessary to determine the Plaintiff Class and Subclass members in that municipality and that municipality's individual financial obligations to those Class and Subclass members.

77.    The appointment of defendants' attorneys as class counsel is appropriate. Trenton is the state capital city, it can fully and vigorously defend this case, and its interests are not in conflict with those of other class members. Hazlet is an adequate representative of townships.

## DAMAGE TO PLAINTIFF CLASS
## BEYOND THE STOLEN VALUE

78.    Home ownership is a core pillar of the American dream. Home ownership is correlated with physical health, mental and emotional health, financial prosperity, a secure retirement, and a solid family life. *See* Luke A Munford, et al., *Is owning your home good for your health? Evidence from exogenous variations in subsidies in England*, 39 Economics and human biology 100903 (2020).

79.    When members of the Plaintiff Class lose their entire home value, they are literally forced out on the streets. It is virtually impossible for them to move into a new home when they have zero money for a down payment after their home equity has been stolen by their government. They end up in apartments, on the

couches of friends and neighbors, or on the streets. Their children are forced to move schools, and their entire lives are disrupted. The loss of a home to foreclosure leads to mental and emotional strain, a decline in physical health, a decline in academic achievement for students in the home, and a multi-generational loss of wealth. *See* Alexander C. Tsai, *Home foreclosure, health, and mental health: a systematic review of individual, aggregate, and contextual associations*, 10 *PloS one* e0123182 (April 7, 2015).

80.    Loss of a home is not just about its immediate effects: it is also about the loss of dignity. Homeownership is a mark of pride, of responsible membership in the community, of citizenship in a neighborhood, of stake in a place. It represents a huge blow to a person's standing in the community to be forced out on the street after a foreclosure. Gregory S. Alexander, *Property, Dignity, and Human Flourishing*, 104 Cornell L. Rev. 991 (2019).

81.    The same is true for those who lose commercial properties. Those who own owner-occupied duplex, family-run restaurants, or small businesses already live on the narrowest of margins. The loss of all value in a commercial property can bankrupt the business and the person who owns it. The owner of that business has to lay off employees, cancel vendor contracts, and stop serving customers. An entire community is affected.

## UNCONSCIONABLE BEHAVIOR BY

## DEFENDANT CLASS

82.    The Defendant Class's cavalier attitude towards the constitutional rights and human dignity of the Plaintiff Class and Subclass is outrageous, displaying a consistent callous indifference that shocks the conscience. For starters, one would think it obvious that intentional government-organized theft on a massive scale would be plainly wrong. And numerous academic and advocacy reports made New Jersey state and local governments aware that their policies were outrageous—especially damaging to their most vulnerable populations: the elderly, communities of color, and those who speak English as a second language. Yet they chose to persist in these policies.

83.    One of the nation's premier academic experts in this area finds "greed and cruel indifference to their victims" pervasive in the tax foreclosure industry. Andrew W. Kahrl, *Unconscionable: Tax Delinquency Sales as a form of dignity taking*, 92 Chicago-Kent L. Rev. 905, 932 (2017). As Professor Andrew Kahrl of the University of Virginia points out in an article for the Chicago-Kent Law Review, "Because minority neighborhoods have historically been subject to discriminatory overtaxation and lower property values as result of segregation and 'redlining,' African American homeowners have been and remain more vulnerable to predatory tax buying." He continues, "Tax buying has inflicted a significant, if underappreciated, economic toll on black America. It contributed, in no small measure, to the precipitous decline of black landownership over the second half of the twentieth

century (from over 15 million acres in 1910 to 2.3 million acres in 1997), prevented African American communities from becoming partners in and beneficiaries of real estate development in some of America's most vibrant markets accelerated the deterioration of urban minority neighborhoods and stymied efforts at recovery, and exacerbated the racial wealth gap. It has also left deep emotional scars on victims, robbing them of their dignity in the course of taking—or threatening to take—their property."

84.    "To homeowners facing eviction, predatory tax buying was a cruel, vicious, indeed unconscionable, act." *Id.* at 923. He concludes, "It is unconscionable, but perhaps not surprising, that many states allow private investors to take someone else's property and all of its equity over a debt that often originates from an accident or oversight." *Id.* at 933.

85.    An FBI probe showed that in New Jersey, private investors unlawfully colluded with each other before tax sale certificate auctions to artificially inflate the interest rates on those certificates—to the detriment of "people already having trouble paying their taxes." Joe Tyrrell, *FBI Probe Snares Another Firm for Rigging Tax-Lien Auctions*, NJ Spotlight News (Jan. 10, 2013), https://www.njspotlight-news.org/2013/01/13-01-09-fbi-probe-snares-another-firm-for-rigging-tax-lien-auctions/.

86.    One analysis of 31 cities in New Jersey from 2014 to 2021 found that on average, homeowners subjected to the process "lost 92% of the value of their

home, or $219,000, above the tax debt that was owed, which averaged $16,800." Angela C. Erickson, *The size and scope of home equity theft: Shining a spotlight on New Jersey*, Pacific Legal Foundation (Nov. 15, 2021), https://pacificlegal.org/size-and-scope-of-home-equity-theft-new-jersey/.

87.    An e-book authored by a New Jersey municipality's Chief Executive Officer, titled *New Jersey Tax Lien Investing*, is advertised as follows: "Tax liens offer a low risk, high reward investment opportunity," and touts that "[l]ien investors often earn triple digit returns on an annualized basis." "There is an opportunity to gain ownership of a property at a modest cost, often less than a down payment on a home or even a new car." New Jersey Tax Lien Investing, Amazon.com, https://www.amazon.com/New-Jersey-Tax-LienInvesting-ebook /dp/B0B2NHJDY9 (last visited April 3, 2024).

88.    Institutionalized value theft preys in particular upon the elderly. A 2012 report from the National Consumer Law Center notes, "Homeowners most at risk are those who have fallen into default because they are incapable of handling their financial affairs, such as individuals suffering from Alzheimers, dementia, or other cognitive disorders." *The Other Foreclosure Crisis*, Nat. Consumer Law Center (July 2012).[2]

---

[2] https://www.nclc.org/wp-content/uploads/2022/09/tax-lien-sales-report.pdf

89.     Institutionalized value theft also disproportionately affects communities of color. An article from the Center for Community Progress notes, "In many communities, delinquent property tax enforcement systems also unfairly burden communities of color. In Baltimore, investigative reporters recently found that properties in the city's majority-Black census tracts have tax liens that are sold at much higher rates than minority-Black census tracts. In Washington, DC, investigative reporters found that Black homeowners disproportionately lost their homes to tax foreclosure and researchers have found that tax foreclosures can contribute to gentrification by displacing homeowners of color." Libby Benton, *Delinquent Property Tax Enforcement Could Be the Missing Piece in Fighting Vacant Properties*, Center for Community Progress (Feb. 21, 2023).[3]

90.     Bloomberg reports similarly that "Generations of Black Americans lost their land to tax liens." Margaret Newkirk, Bloomberg (June 29, 2022).[4] In an earlier article, Bloomberg reported, "For decades, racist property assessments and predatory tax-debt sales went hand-in-hand in Chicago. The system came to be known as the 'Black Tax.'" Kriston Capps, *How the 'Black Tax' Destroyed African-American Homeownership in Chicago*, Bloomberg (June 11, 2015).[5]

---

[3] https://communityprogress.org/blog/delinquent-property-tax-enforcement-could-be-the-missing-piece-in-fighting-vacant-properties/
[4] https://www.bloomberg.com/news/features/2022-06-29/tax-liens-cost-generations-of-black-americans-their-land
[5] https://www.bloomberg.com/news/articles/2015-06-11/how-predatory-tax-lien-sales-destroyed-homeownership-for-african-americans-in-chicago

91.     Professor Andrew Kahrl explains in the Bloomberg story: "This is a predatory enterprise that's being conducted by the state." Municipal governments like Defendants are "facilitating and helping to manage these predatory tax buyers who are preying on their own citizens. [The governments are] not just complicit—they're cogs in this industry, key players." *Id.*

92.     Finally, several months after *Tyler*, the New Jersey Supreme Court temporarily suspended Office of Foreclosure recommendations of final judgment in tax sale certificate cases filed after May 25, 2023, the date that *Tyler* was decided—meaning that the Court attempted to put New Jersey's unlawful policies on pause as of that date. Yet the State of New Jersey has not changed its statutes in the wake of *Tyler*. And upon information and belief, municipalities have continued executing tax sale certificates after *Tyler*.

## CLAIMS

### Count I: The Defendant Class had an established policy and practice of taking property without just compensation in violation of the U.S. Constitution.

93.     The foregoing allegations, particularly paragraphs 30 to 52, are incorporated herein by reference.

94.     The Fifth Amendment to the U.S. Constitution, as incorporated against the States and their political subdivisions by the Fourteenth Amendment, forbids municipalities to take property without just compensation. As the Supreme

Court held in *Tyler*, a taxing authority effects an uncompensated (and thus uncon-
stitutional) taking when it keeps the surplus value after enforcing a tax lien.

95.    Plaintiffs and members of the Plaintiff Class had legal ownership of
their properties and have a property interest in the surplus proceeds that the tak-
ings clause protects, per *Tyler*.

96.    Here, the municipalities took property from the plaintiffs and the class
members for public use without just compensation.

97.    The tax sale certificate process administered by Defendants took
Plaintiffs' and Plaintiff Class members' real property and fails to return to Plaintiffs
and Plaintiff Class members their surplus proceeds or value.

98.    The municipalities take the revenue received from the tax foreclosures
they execute directly for public use, namely as general revenue for their budgets
and those of associated taxing districts (like schools), which in turn fund a wide
variety of public services. However, they do not provide just compensation for these
takings.

99.    In other instances, when the tax sale certificate authorizes a taking by
a private party, the surplus proceeds are not used for public use at all, but instead
line the pockets of private parties.

100.    Defendants did not provide or offer just compensation before, during,
or after taking the property of Plaintiffs and the Plaintiff Class.

101.   It is the policy, custom and practice of the Defendants and the Defendant Class to authorize and execute takings without requiring or themselves returning the surplus proceeds or value to the Plaintiffs and Plaintiff Class.

102.   Neither the state law nor any individual Defendant municipality has a procedure by which the Plaintiffs or members of the Plaintiff Class could recover their surplus value (a fact noted in the Working Group report).

103.   A legislature cannot constitutionally enact a law that effects a taking of private property without just compensation.

104.   Nor can Ms. Sciarrotta and the State Division of Taxation constitutionally administer and supervise compliance with such a statute.

105.   These Defendants and the Defendant Class are acting under color of state law when they authorize and execute these takings from the Plaintiffs and the Plaintiff Class, depriving them of a federal constitutional right.

106.   The surplus property value taken from the Plaintiff Class and Subclass must be returned to them by the Defendant Class.

### Count II: The Defendants and Defendant Class levied excessive fines on Plaintiffs and the Plaintiff Class and Subclass.

107.   The foregoing factual allegations, particularly paragraphs 34 to 37, are incorporated herein by reference.

108.   Municipalities are barred by the Eighth Amendment to the U.S. Constitution, as incorporated against them by the Fourteenth Amendment, from imposing excessive fines.

109.   Similarly, Ms. Sciarrotta and the Division of Taxation are barred from administering and supervising compliance with statutes that impose excessive fines.

110.   New Jersey's policy choice to take the surplus value from delinquent property taxpayers is, at least in part, a punitive policy designed to punish lawbreakers and to disincentivize others from lawbreaking.

111.   Excessive fines are disproportionate fines. *See Timbs v. Indiana*, 139 S. Ct. 682, 693 (2019).

112.   "The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Cheeseman*, 600 F.3d 270, 283 (3d Cir. 2010) (cleaned up).

113.   The Supreme Court, in its seminal modern case on excessive fines, found it excessive to impose a forfeiture of $357,000 for a single failure to report carrying more than $10,000 outside the United States. *United States v. Bajakajian*, 524 U.S. 321, 324 (1998).

114.   Here, the single offense of failure to pay property taxes, which may amount to as little as a few thousand dollars, results in sanctions equivalent to the entire fair market value of a property, which may reach millions of dollars. This is

unconstitutionally disproportionate in violation of the Eighth Amendment's excessive-fines clause.

115.   Dorothy Thompson, for instance, was forced to forfeit value at thirteen times what she owed. Barry Seward and Trude forfeited about ten times what they owed. Their experiences mirror the overall experience of the Plaintiff Class.

### Count III: The Defendants and Defendant Class committed the tort of inverse condemnation against the Plaintiffs and Plaintiff Class and Subclass.

116.   The foregoing factual allegations, particularly paragraphs 30 to 52, are incorporated herein by reference.

117.   Inverse condemnation allows a landowner to recover compensation for the taking of property interests in circumstances where "the government seizes property without first bringing a condemnation proceeding" via eminent domain. *Klumpp v. Borough of Avalon*, 997 A.2d 967, 976 (N.J. 2010)

118.   That is precisely what happened here: the Plaintiffs and Plaintiff Class and Subclass owned each piece of property, the government took each piece of property, but the government did not take the property through eminent-domain proceedings. Instead, the municipal tax officer directly appropriated the property through a tax sale certificate either retained or sold to an investor, followed by foreclosure and a retention of the surplus value above and beyond the taxes and interest owed. This is a classic inverse condemnation: taking property without

going through eminent-domain proceedings and therefore without paying just compensation.

119.   When an inverse condemnation takes place, the government owes just compensation to the former property owner. Here, just compensation equals the difference between the taxes and the fair market value of the property. Just compensation is "measured by the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." *Borough of Harvey Cedars v. Karan*, 70 A.3d 524, 535 (N.J. 2013) (cleaned up).

### Count IV: The Plaintiffs and Plaintiff Class and Subclass's money was subject to tortious conversion by the Defendants and the Defendant Class.

120.   The foregoing paragraphs, particularly paragraphs 30 to 52, are incorporated herein by reference.

121.   "The essential elements of the common-law action in conversion are: (a) that the property and right to immediate possession thereof belong to the plaintiff; and (b) the wrongful act of interference with that right by the defendant." *First Nat. Bank of Bloomingdale v. N. Jersey Tr. Co., Ridgewood*, 14 A.2d 765, 767 (N.J. Sup. Ct. 1940).

122.   "[C]onversion applies to money, provided that the money has belonged to the injured party and that it be identifiable." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 660 (N.J. 2020) (cleaned up).

123.   The Plaintiffs and the Plaintiff Class and Subclass have a right to the surplus value above the taxes and fees owed, per *Tyler*.

124.   That right is immediate, absolute, and unconditional.

125.   The Plaintiffs and the Plaintiff Class and Subclass are excused from the necessity of making a demand because the money is no longer "in the possession of" the Defendants, so "a demand for [it] would have been useless." *Mueller v. Tech. Devices Corp.*, 84 A.2d 620, 623 (N.J. 1951).

126.   Here, the Defendants and Defendant Class executed the tax sale foreclosure, thus converting Plaintiffs' property, then transferred the property to either the tax sale certificate holder (who could then foreclose) or a buyer after foreclosure; either way, the municipality no longer possesses the property. As a result, a demand would be futile because the Defendants no longer possess the property at issue (or the surplus value in the property).

127.   If necessary, the Court could create a subclass of Plaintiffs specific to this claim to exclude those Plaintiffs whose land (or surplus value) is still retained by the Defendants.

128.   The Defendants and Defendant Class wrongfully took the surplus value: it was an unconstitutional act, per *Tyler*.

129.   The money that has been converted is capable of being described with specificity: the difference in each individual case between the fair market value of the property and the amount of taxes and fees owed on the property.

130.    Therefore, all four elements are met: the Plaintiffs have a right to the specific funds, that right is immediate, the need to demand the funds return is excused, and the taking of the funds was wrongful.

### Count V: The Defendants and Defendant Class enjoy unjust enrichment from their theft of the surplus value.

131.    The foregoing factual allegations, particularly paragraphs 30 to 52, are incorporated herein by reference.

132.    "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994).

133.    These elements are met. Regardless of whether the Defendants and Defendant Class retained the property, sold the property themselves, or sold the tax sale certificate to third-party investors, they secured surplus value in their own accounts that they have unjustly retained, either as the real property itself or as the money from the sale proceeds.

134.    The retention of the property or sale proceeds in excess of what a debtor owes is contrary to fundamental principles of equity and justice, as indicated by the fact that New Jersey forbids banks from keeping excess surplus from foreclosure sales.

135.    If necessary, for purposes of this claim, the Court could order a subclass created within the Plaintiff Class to only cover only those Plaintiff Class

members whose properties were sold after foreclosure by the Defendants or De-
fendant Class or retained by the Defendants or Defendant Class.

### Count VI: The Defendants and Defendant Class have committed the tort of money had and received.

136.    The foregoing factual allegations, particularly paragraphs 30 to 52, are incorporated herein by reference.

137.    A cause of action for money had and received can be maintained when a defendant has received money that in equity and good conscience belongs to the plaintiff. *See Redding v. Burlington Cnty. Welfare Bd.*, 323 A.2d 477, 480 (N.J. 1974).

138.    Here, the Defendants received money (the surplus value) that in equity and good conscience belongs to the Plaintiffs.

139.    Again, if necessary, the Court can certify a subclass of Plaintiffs spe-
cific to this claim for property owners whose properties were retained or sold after foreclosure by the Defendants or the Defendant Class.

### Count VII: The Defendants and Defendant Class violated the takings clause rights of Plaintiff and Plaintiff Class and Subclass under the New Jersey Constitution.

140.    The foregoing paragraphs, particularly 30 to 52, are incorporated herein by reference.

141.    Article I, Section 20 of the New Jersey Constitution provides: "Private property shall not be taken for public use without just compensation.  Individuals

or private corporations shall not be authorized to take private property for public use without just compensation first made to the owners."

142.   This provision is enforceable under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2.

143.   The New Jersey Constitution's protection against takings is generally coextensive with the federal Constitution's. *See Klumpp v. Borough of Avalon*, 997 A.2d 967, 975 (N.J. 2010).

144.   However, the New Jersey Constitution is more specific in its text than the U.S. Constitution ins specifically barring individuals and private corporations from takings of private property as well.

145.   Because there has been a taking here under the federal constitution, per *Tyler*, the application of the same standard inevitably leads to the conclusion that there was a taking under the state constitution as well.

### Count VIII: The Defendants and Defendant Class violated the rights of Plaintiffs and Plaintiff Class and Subclass under the New Jersey Constitution's Excessive Fines Clause.

146.   The foregoing paragraphs, particularly 30 to 52, are incorporated herein by reference.

147.   Article 1, Section 12 of the New Jersey Constitution prohibits the imposition of excessive fines.

148.   This provision is enforceable under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2.

149.   The state constitutional analysis mirrors the federal excessive fines analysis. *See State v. Anderson*, 256 A.3d 981, 989 n.5 (N.J. 2021).

150.   Because excessive fines have been levied here under the federal constitution, applying the same standard inevitably leads to the conclusion that there was an excessive fine under the state constitution as well.

## PRAYER FOR RELIEF

Given the foregoing, Plaintiffs, on behalf of themselves and the Plaintiff Class and Subclass, respectfully request that the Court:

1.    Certify the Plaintiff Class, designate the Plaintiffs as representative of the Plaintiff Class, and appoint the undersigned as Class Counsel;

2.    Certify the Defendant Class, designate the Defendants as representatives of the Defendant Class, and appoint the counsel for Defendants as Class Counsel;

3.    Pursuant to the Declaratory Judgment Act (28 U.S.C. §2201 and Fed. R. Civ. Proc. 57), provide relief by declaring that the uncompensated seizure of surplus value in property pursuant to New Jersey's Tax Sale Law is unlawful under the Fifth Amendment to the U.S. Constitution, the Eighth Amendment to the U.S. Constitution, and the New Jersey Constitution;

4.    Award Plaintiffs and the Plaintiff Class just compensation for the unconstitutional taking of their property, namely the difference between the back

taxes and interest owed and the fair market value of their property at the time of foreclosure, with interest;

5.    Award Plaintiffs and the Plaintiff Class economic damages for the torts committed against them, namely the difference between the taxes and fees owed and the fair market value of their properties;

6.    In the alternative, if necessary, certify a subclass of Plaintiffs whose properties were sold after foreclosure or retained by the Defendants or Defendant Class and award economic damages specific to the claim for unjust enrichment;

7.    Award the Plaintiffs and Plaintiff Class nominal damages for the violation of their state and federal constitutional rights;

8.    Award the Plaintiffs and the Plaintiff Class reasonable attorney's fees and costs, as provided by law;

9.    Grant the Plaintiffs and the Plaintiff Class such other relief as is just and proper to recognize their claims and protect their rights to just compensation and appropriate damages.

## JURY DEMAND

Plaintiffs demand a jury for the resolution at trial of all issues so triable and will ensure adequate trial counsel as provided in the local rules when trial is scheduled.

Respectfully submitted,

Mark R. Scirocco/061192013
SCIROCCO LAW, P.C.
143 Washington Street
Morristown, NJ 07960
(973)691-1188
Fax: (973)691-3353
mark@sciroccoesq.com

Daniel R. Suhr
Hughes & Suhr LLC
747 N. LaSalle St., Suite 210
Chicago, IL 60654
414.588.1658
dsuhr@hughesandsuhr.com
*Pro Hac Vice motion forthcoming*

Christopher E. Mills
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
843-606-0640
cmills@spero.law
*Pro Hac Vice motion forthcoming*

Dated: May 21, 2024