UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Trenton Vicinage

| | |
|---|---|
| **Dorothy M. Thompson, Barry Seward, Trude Sherrod-Polan, Karin Knight-Capes, and Kyle Gray**, *on behalf of themselves and all others similarly situated*, | |
| Plaintiffs, | Case Number: 24-cv-6295 |
| *v.* | |
| **Constance Ludden, the City of Trenton, Rachel Hundley, the Township of Hazlet, Susan E. McCloskey, the Township of Lawrence, Mackenzi Kelly, and the Borough of Paulsboro,** *on behalf of themselves and all others similarly situated*, | Motion Day: January 21, 2025 |
| Defendants. | |

**PLAINTIFFS' COMBINED OPPOSITION TO
MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. ii

Introduction ....................................................................................................... 1

Statement of the Case......................................................................................... 3

Legal Standard ................................................................................................... 5

Argument ........................................................................................................... 5

   I.   *Tyler* applies retroactively............................................................................ 5

  II.  The government's transfer of the Plaintiffs' property to third parties—
without providing just compensation—is unlawful. ..................................11

      A.  Transfers of property by the government to other private owners are
takings. .................................................................................................12

      B.  Precedent supports the Plaintiffs' taking claims. ...............................14

      C.  The Defendants' theory would undermine protections against takings.
.............................................................................................................17

      D.  The defendant municipalities are liable for failing to pay just
compensation. .....................................................................................19

 III.  Paulsboro's recasting of its takings argument as about standing fails because
taking of surplus equity is an injury. ..........................................................22

 IV. Plaintiff Gray states an inverse condemnation claim..................................25

  V.  Plaintiff Sherrod-Polan did not waive her claims here. ..............................27

 VI. Plaintiff Knight-Capes's property was located within the jurisdiction of a
Defendant class member. ............................................................................30

VII. Dismissal without prejudice is appropriate for Counts IV, V, and VI..........30

VIII.  The individual Defendants are appropriately liable in their official
capacities. ...................................................................................................31

Conclusion ........................................................................................................32

# TABLE OF AUTHORITIES

## CASES

*257-261 20th Ave. Realty, LLC v. Roberto*, 307 A.3d 19, 34 (N.J. Super. App. Div. 2023) -----------6, 9, 13, 14, 17, 29

*8 Erie St. JC LLC v. City of Jersey City*, No. 19-CV-9351, 2020 WL 2611540, at *2 (D.N.J. May 21, 2020)--------------- 32

*Ace Holding Partners, LLC v. Corr*, No. A-3488-21, 2023 WL 4770872, at *4 (N.J. Super. Ct. App. Div. July 27, 2023)
    (Memo. 8)-------------------------------------------------------------------------------------------- 9

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ------------------------- 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)-------------------------------------------------------- 5

*Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d Cir. 1996) ------------------------------------------ 30

*Brady v. United States*, 397 U.S. 742, 748 (1970) ---------------------------------------------------------- 27

*Cont'l Res. v. Fair*, 10 N.W.3d 510, 518 (Neb. 2024) -------------------------------------------------------- 14

*Corlew v. Borough*, No. 3:22-CV-01990, 2024 WL 1051980, at *3 (M.D. Pa. Mar. 11, 2024) -------------------------- 32

*County of Morris v. Nationalist Movement*, 273 F.3d 527, 534 n.4 (3d Cir. 2001) ------------------------------------- 32

*Cummings v. Missouri*, 71 U.S. 277, 325 (1866)----------------------------------------------------------- 18

*Davenport v. Town of Reading*, No. CV 22-12239-RGS, 2024 WL 4495105, at *2 (D. Mass. Oct. 15, 2024)----------- 8

*Greenway Dev. Co. v. Borough of Paramus*, 750 A.2d 764, 770 (N.J. 2000)----------------------------------- 25, 31

*Hall v. Meisner*, 51 F.4th 185, 195 (6th Cir. 2022) --------------------------------------------------------- 16

*Halpern v. Centroid Systems, Inc.*, No. 2:24-CV-07037, 2024 WL 4533370, at *3 (D.N.J. Oct. 21, 2024)--------------- 22

*Harper v. Virginia Dep't of Tax'n*, 509 U.S. 86, 96 (1993)---------------------------------------------6, 7, 8, 9, 11

*Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 243 (1984)---------------------------------------------------- 13, 14

*In re Grand Jury Matter*, 673 F.2d 688, 693 n.11 (3d Cir. 1982)----------------------------------------------- 18

*Jackson v. Southfield Neighborhood Revitalization Initiative*, No. 361397, 2023 WL 6164992, at *16 (Mich. Ct.
    App. Sept. 21, 2023)----------------------------------------------------------------------------- 16, 24

*Kelo v. City of New London*, 545 U.S. 469, 477 (2005)-----------------------------------------------12, 13, 15

*Kentucky v. Graham*, 473 U.S. 159, 165 (1985)----------------------------------------------------------- 31

*Klumpp v. Borough of Avalon*, 997 A.2d 967, 976 (N.J. 2010) ------------------------------------------------- 18, 25

*Labega v. Joshi*, 270 A.3d 378, 386 (N.J. Super. App. Div. 2022)----------------------------------------------- 28

*McMahon v. Fulcomer*, 821 F.2d 934, 944 (3d Cir. 1987) ---------------------------------------------------- 27

*Nextel Ptnrs. Inc., v. Kingston Twp.*, 286 F.3d 687, 693 (3d Cir. 2002)---------------------------------------------- 32

*Nieveen v. TAX 106*, 143 S. Ct. 2580 (2023) --------------------------------------------------------------- 6

*Polizzi v. Cnty. of Schoharie*, 720 F. Supp. 3d 141, 149 (N.D.N.Y. 2024) ------------------------------------ 7, 21, 22

*Princeton Off. Park, LP v. Plymouth Park Tax Servs., LLC*, 93 A.3d 332, 340–41 (N.J. 2014) ------------------------- 13

*Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 758 (1995) -------------------------------------------------- 10

*Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 593 (3d Cir. 2020)------------------------------------------------- 6

*Rieder v. State Dep't of Transp.*, 535 A.2d 512, 515 (N.J. Super. App. Div. 1987) ------------------------------------ 26

*Ross v. Lowitz*, 120 A.3d 178 (N.J. 2015)----------------------------------------------------------------- 28

*Schafer v. Kent Cnty.*, No. 164975, 2024 WL 3573500, at *15 (Mich. July 29, 2024) ------------------------------- 7

*Shapiro v. Aetna, Inc.*, No. 22-CV-1958-ES-AME, 2023 WL 4348601, at *5 (D.N.J. June 5, 2023) ------------------ 32

*Sharritt v. Henry*, No. 23-C-15838, 2024 WL 4524501, at *13 n.10 (N.D. Ill. Oct. 18, 2024)  8, 11, 12, 13, 15, 20, 22

*Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013) ---------------------------------------------- 5

*Stephanatos v. Wayne Twp.*, No. 12-cv-1793, 2024 WL 1757061, *2 (D.N.J. April 4, 2024) ----------------------- 10, 17

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010)------------------------------ 18

*Talley v. Pennsylvania Dep't of Corr.*, No. CV 19-1589-KSM, 2024 WL 1253626, at *15 n.28 (E.D. Pa. Mar. 21,
    2024)------------------------------------------------------------------------------------------- 30

*Tyler. Fair v. Cont'l Res.*, 143 S. Ct. 2580 (2023) --------------------------------------------------------- 6

*United States v. Brown*, 849 F.3d 87, 91 n.7 (3d Cir. 2017) ----------------------------------------------- 27, 29

*Watkins v. Healy*, 429 F. Supp. 3d 420, 427 (E.D. Mich. 2019), *aff'd*, 986 F.3d 648 (6th Cir. 2021) -------------------- 8

*Woodbridge v. City of Greenfield*, No. CV 23-30093-TSH, 2024 WL 2785052, at *5 (D. Mass. May 29, 2024) ---- 20

*Zydus Worldwide DMCC v. Teva API Inc.*, 461 F. Supp. 3d 119, 133 (D.N.J. 2020)------------------------------- 28

## STATUTES

N.J. Stat. Ann. § 54:5-104.32 -------------------------------------------------------------------------------- 20

N.J. Stat. Ann. § 54:5-19 -------------------------------------------------------------------------------------- 3

N.J. Stat. Ann. § 54:5-37 -------------------------------------------------------------------------------------- 21

N.J. Stat. Ann. §§ 20:3-1 to -50 ---------------------------------------------------------------------------- 25

N.J. Stat. Ann. §§ 54:5-86, -87 ----------------------------------------------------------------------------- 13

New Jersey Contractual Liability Act ----------------------------------------------------------------------- 30

New Jersey Stat. Ann. § 54:5-104.64(a) ------------------------------------------------------------------- 29

New Jersey Tort Claims Act (TCA) -------------------------------------------------------------------------- 30

## OTHER AUTHORITIES

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999) --------------------------- 2, 19, 23

New Jersey's Tax Sale Law ------------------------------------------------------------------------------------ 3

*Tyler* -------------------------------------------------------------------- 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 18, 19, 24, 28, 29

## RULES

Fed. R. Civ. P. 7(b)(1)(B) ------------------------------------------------------------------------------------ 20

New Jersey's tort claims notice rule ------------------------------------------------------------------------ 3

Rule 12(b)(6) ----------------------------------------------------------------------------------------------------- 5

## CONSTITUTIONAL PROVISIONS

federal and state Excessive Fines Clauses ----------------------------------------------------------------- 1

N.J. Const. art. I, ¶ 20 ------------------------------------------------------------------------------------- 14, 19

New Jersey Excessive Fines -------------------------------------------------------------------------------------- 5

New Jersey's Takings Clause ------------------------------------------------------------------------------- 1, 5, 11

U.S. Const. amend. V ------------------------------------------------------------------------------------------ 19

## INTRODUCTION

This case involves repeated seizures by New Jersey municipalities of property from private owners without just compensation by the municipality to the property owner for the property's value. As the Supreme Court recently confirmed in *Tyler v. Hennepin County*, taking property from an owner behind on taxes without compensating the owner for the surplus value of the property above the tax delinquency violates the federal Constitution. 598 U.S. 631 (2023). Refusing to provide compensation for that surplus value also violates New Jersey's Takings Clause and both the federal and state Excessive Fines Clauses.

The Defendants raise a host of arguments to try to avoid defending their refusal to provide just compensation to the Plaintiffs and similarly situated former property owners. Despite the quantity of arguments, they fail to show that the Plaintiffs' case should be dismissed. Not only do the Defendants say almost nothing about the Plaintiffs' excessive fines claims, the arguments they advance about Plaintiffs' takings claims fail.

First, the constitutional rule that the Supreme Court explicated in *Tyler* applies to the Plaintiffs' federal takings claim. For one thing, the Court applied that rule in *Tyler* itself, where the taking (obviously) happened before the Supreme Court's decision. If the Supreme Court's rule applied to the facts in *Tyler*, it equally applies to the facts here, as Plaintiffs' claims arose in the same general time period as (indeed, mostly much later than) plaintiff's claim in *Tyler*. The Plaintiffs' claims do not present a "retroactivity" issue; so-called "pipeline retroactivity" is a state law doctrine that is inapplicable to the federal Takings Clause, as *Tyler*'s application of

its rule to the facts before the Court confirms. Nor did the Court overrule any case in *Tyler* or announce "new law"; *Tyler* was merely an application of longstanding doctrine under the Takings Clause, confirming what the law has long been.  And of course, *Tyler* said nothing about the Plaintiffs' state constitutional claims or federal excessive fines claim, so there is no conceivable retroactivity issue as to those claims.

On the merits, the Plaintiffs state takings claims because the government transferred their properties without compensating them for the surplus equity. It makes no difference that most of the municipalities transferred the Plaintiffs' properties to other private entities rather than retaining the properties for themselves. "[T]he question is what has the owner lost, not what has the taker gained." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999). As many similar cases hold, inserting a private entity into the takings chain does not immunize the government from takings liability. Regardless of the ultimate owner, the municipalities effectuated the taking and failed to honor their obligation to provide just compensation for the surplus value. And the Plaintiffs are challenging solely Defendants' failure to provide just compensation—not the foreclosure on their properties, which they agree the Defendants had the power to effectuate. They have stated takings and excessive fines claims.

Thus, the Court should deny the motion to dismiss as to the Plaintiffs' takings, excessive fines, and inverse condemnation claims (Counts I, II, III, VII, and VIII) against the municipal Defendants. As explained below, dismissal without prejudice is appropriate for the Plaintiffs' tort and unjust enrichment claims (Counts IV

through VI) based on the Defendants' invocation of sovereign immunity and New Jersey's tort claims notice rule.

## STATEMENT OF THE CASE

This case is a putative class action on behalf of all property owners who suffered an uncompensated taking of property value above any property taxes the property owners owed. The named Plaintiffs are property owners who had their properties taken by their municipality to be either transferred to private entities or kept by the municipality. ECF No. 27 ("Am. Compl.") ¶¶ 9–14, 34–38. For them, the amount of taxes owed was less than their property value, but the municipalities failed to compensate them for this surplus value. *Id.* ¶¶ 34–38.

The municipalities relied on New Jersey's Tax Sale Law to effectuate the takings. Under that law—which was recently amended by the Legislature in recognition that the prior version was incompatible with *Tyler*—a municipal tax officer creates a tax sale certificate based on tax delinquencies, and the officer sells the certificate to a private entity or retains it for the municipality. *See* N.J. Stat. Ann. § 54:5-19 (explaining that the municipality may "enforce the lien by selling the property"); *id.* §§ 54:5-5 to -50. After a redemption period, the certificate holder can foreclose on the property. *Id.* §§ 54:5-86, -87; *see id.* §§ 54:5-104.32, 32a. The forecloser can then either keep the property or sell it. Either way, the municipality never provides the surplus value to the original property owner—unlike in a regular bank foreclosure, in which the bank "must return any surplus equity." Am. Compl. ¶ 43. Nothing in New Jersey law prohibits the municipality from honoring its

constitutional obligation to provide compensation for this taking, but the Defendants did not do so. *See generally id.* ¶¶ 28–33, 46.

As the complaint alleges, "[m]unicipalities make more money than they otherwise would from collecting taxes when they sell these liens (tax sale certificates)," because "purchasers know New Jersey law entitles them to keep the surplus over and above the back taxes in the event they foreclose on the property." *Id.* ¶ 41. "The tax sale certificates are worth more at auction because the third-party investor receives a conditional right to the surplus value in the event that, as often happens and as happened to [P]laintiffs here, the taxpayer is unable to pay the redemption amount within the designated time period." *Id.*

A New Jersey Supreme Court Working Group recently acknowledged the unlawfulness of New Jersey's prior approach, and the General Assembly did too. The Assembly amended the law because it was not "consistent with the takings clause." *Id.* ¶¶ 48–60. Yet these Defendants have still failed to provide compensation for surplus value.

The burden of these uncompensated takings falls largely on the "poor, elderly, and vulnerable." *Id.* ¶ 5; *see id.* ¶ 92. Experts have explained that predatory tax buying like in New Jersey has "left deep emotional scars on victims, robbing them of their dignity in the course of taking—or threatening to take—their property." *Id.* ¶ 93. "One analysis of 31 cities in New Jersey from 2014 to 2021 found that on average, homeowners subjected to the process 'lost 92% of the value of their home, or $219,000, above the tax debt that was owed, which averaged $16,800.'" *Id.* ¶ 96.

The Plaintiffs filed this suit on behalf of a class of similarly situated owners whose property was taken without the surplus value being returned, against a class of Defendant municipalities. Their claims are, by count: (I) federal Takings Clause, (II) federal Excessive Fines, (III) tort of inverse condemnation, (IV) tortious conversion, (V) unjust enrichment, (VI) tort of money had and received, (VII) New Jersey Takings Clause, and (VIII) New Jersey Excessive Fines. *Id.* ¶¶ 102–57.

The Defendants have moved to dismiss all claims with prejudice. The memorandum supporting the Defendants' primary motion to dismiss, filed by the City of Trenton and others, is cited here as "Memo." ECF No. 29-1. The memorandum filed by the Township of Hazlet and Rachel Hundley is cited as "Hazlet Memo." ECF No. 35-1. The memorandum filed by the Borough of Paulsboro and Mackenzi Kelly is cited as "Paulsboro Memo." ECF No. 45-1.

## LEGAL STANDARD

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations 'could not raise a claim of entitlement to relief.'" *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558 (2007)).

## ARGUMENT

### I.  *Tyler* applies.

T Defendants' lead argument is that *Tyler* does not apply to Plaintiffs' claims because the constitutional rule it explicated is confined to cases already in the "pipeline" when it was decided. This argument contradicts binding precedent. A

"rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." *Harper v. Virginia Dep't of Tax'n*, 509 U.S. 86, 96 (1993). In other words, when the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect" "as to all events, regardless of whether such events predate or postdate [its] announcement of the rule." *Id.* at 97. The Supreme Court thus "prohibit[ed] the erection of selective temporal barriers to the application of federal law in noncriminal cases." *Id.*; *see also Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 593 (3d Cir. 2020) (same).

The Plaintiffs here brought suit after *Tyler* based on events that partially predate *Tyler*. Thus, the only "retroactivity" question here is whether the Supreme Court in *Tyler* "applie[d]" its rule "to the parties before it." *Harper*, 509 U.S. at 97. It did. *Tyler* held that the plaintiff "plausibly alleged a taking under the Fifth Amendment" and thus "reversed" the lower court judgment. 598 U.S. at 647. The Supreme Court then further granted certiorari and vacated similar judgments based on pre-*Tyler* facts, remanding those cases "for further consideration in light of" *Tyler*. *Fair v. Cont'l Res.*, 143 S. Ct. 2580 (2023); *Nieveen v. TAX 106*, 143 S. Ct. 2580 (2023). According to the very case relied on by the Defendants, those remands "confirm[]" "the retroactive application of *Tyler*," since they would have been pointless were *Tyler* not applicable to takings that occurred before *Tyler* issued. *257-261 20th Ave. Realty, LLC v. Roberto*, 307 A.3d 19, 34 (N.J. Super. App. Div. 2023).

Well-reasoned federal decisions agree that *Tyler* applies to events that predated that decision. For instance, the Northern District of New York rejected the Defendants' argument, holding that "[a] straightforward application of *Harper*'s holding leads to the conclusion that *Tyler* applies to plaintiffs' § 1983 Takings Clause claims: *Tyler* has 'full retroactive effect as to all events,' even if those events—such as the tax sales—'predate[d]' the announcement of the rule." *Polizzi v. Cnty. of Schoharie*, 720 F. Supp. 3d 141, 149 (N.D.N.Y. 2024) (cleaned up) (quoting *Harper*, 509 U.S. at 97).

What is more, as that court explained, "even if there were some doubt about how this retroactivity question should be answered, it bears emphasizing that a § 1983 takings claim based on the retention of a taxpayer's surplus equity was already viable before the Supreme Court decided *Tyler*." *Id.* (collecting cases). So while "the Supreme Court's decision in *Tyler* appears to have strengthened the force of plaintiffs' § 1983 claims," "it did not create them out of whole cloth." *Id.*

Put another way, *Tyler* did not give rise to a new legal rule: it did not overrule any decision and instead relied on established "precedents [that] have also recognized the principle that a taxpayer is entitled to the surplus in excess of the debt owed." *Tyler*, 598 U.S. at 642; *accord Schafer v. Kent Cnty.*, No. 164975, 2024 WL 3573500, at *15 (Mich. July 29, 2024) (applying *Tyler* and a state analogue retroactively because "a centuries-long line of jurisprudence recognizes a property owner's right to surplus proceeds, and governments cannot take property without just compensation").

Other district courts have agreed in similar cases that the same "retroactivity argument" the Defendants advance is "wrong," relying on the Supreme Court's language in *Harper*. *Sharritt v. Henry*, No. 23-C-15838, 2024 WL 4524501, at *13 n.10 (N.D. Ill. Oct. 18, 2024); *accord Davenport v. Town of Reading*, No. CV 22-12239-RGS, 2024 WL 4495105, at *2 (D. Mass. Oct. 15, 2024) (applying *Tyler* to pre-2023 actions).

The Defendants' primary response to all this is to mischaracterize Supreme Court precedent. According to the Defendants, *Harper* says that "the 'retroactive effect' of the newly-articulated Supreme Court standard applies only to 'cases *still open on direct review*.'" Memo. 7 (emphasis by Defendants) (quoting *Harper*, 509 U.S. at 97); *see* Paulsboro Memo. 4. That badly misrepresents *Harper*. The sentence the Defendants partially quote actually says *the opposite*: the rule "must be given full retroactive effect in all cases still open on direct review *and as to all events, regardless of whether such events predate or postdate [its] announcement of the rule*." *Harper*, 509 U.S. at 97 (emphasis added).

In other words, the rule applies *both* to cases that had already been filed *and* to future cases involving past (or post-decision) events. "[T]he plain language of *Harper* shows that its retroactivity rule is not limited to cases that are pending on direct review." *Watkins v. Healy*, 429 F. Supp. 3d 420, 427 (E.D. Mich. 2019), *aff'd*, 986 F.3d 648 (6th Cir. 2021). Not only does *Harper*'s language refute the Defendants' argument, but in *Harper*, "the Supreme Court applied one of its earlier decisions retroactively even though *Harper* itself was not pending on direct review—indeed, had not even been filed." *Id.* And it would make no sense for a rule

8

to retroactively apply *only* to cases that had already been filed and not to new cases involving events that also predated (or even postdated) the decision. *Harper* "prohibit[ed] the erection of selective temporal barriers to the application of federal law in noncriminal cases." 509 U.S. at 97. Here, the Plaintiffs' case was not closed before *Tyler*—it had not even been filed—so that some of its underlying events predated *Tyler* is irrelevant. *Tyler* applies.

Relying on a New Jersey state court decision, the Defendants argue that only "pipeline retroactivity" applies—in other words, that *Tyler* is limited to cases already filed. Memo. 7–8 (quoting *Roberto*, 307 A.3d at 34); Paulsboro Memo. 4–5 (same). There are at least three problems with this argument. *First*, "pipeline retroactivity" is a New Jersey state law doctrine with no relevance because "federal courts follow a different rule": they do not "'permit the substantive law to shift and spring according to the particular equities of individual parties' claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule.'" *Riccio*, 954 F.3d at 593 (cleaned up) (quoting *Harper*, 509 U.S. at 97). *Second*, as explained above, *Tyler* is not a new rule and simply applied longstanding precedent, so there is no retroactivity question to begin. And *third*, the state decision cited by the Defendants held in favor of *at least* pipeline retroactivity; that decision did not need to consider retroactivity to new cases. *See Roberto*, 307 A.3d at 34.[1]

---

[1] The *Roberto* opinion also has limited value as it is under active review by the New Jersey Supreme Court. Dkt. No. 088959. The other state case cited by the Defendants said nothing about retroactivity. *See Ace Holding Partners, LLC v. Corr*, No. A-3488-21, 2023 WL 4770872, at *4 (N.J. Super. Ct. App. Div. July 27, 2023) (Memo. 8).

The Defendants' only other citation is to an unpublished denial of a motion for reconsideration, but the denial does not help the Defendants either. *See* Memo. 8 (citing *Stephanatos v. Wayne Twp.*, No. 12-cv-1793, 2024 WL 1757061, *2 (D.N.J. April 4, 2024)). *Stephanatos* involved a *pro se* plaintiff who brought various § 1983 claims related to foreclosure, claims that were dismissed on the merits in 2013. 2024 WL 1757061, at *1. The plaintiff then "made various unsuccessful efforts to appeal or reopen his case and relitigate claims already adjudicated," including based on *Tyler* (decided in 2023). The court denied the motion to reopen the case on three grounds: "that (i) *Tyler* was not relevant to any claims previously asserted by Plaintiff; (ii) Plaintiff sought to raise a new Takings Clause claim but did not allege any excess proceeds from the sale of his property; and (iii) in any event, changes in federal law are only retroactively applied to cases that are still open for review." *Id.*

This unpublished decision simply held that the plaintiff had "fail[ed] to state a sufficient basis for reconsideration." *Id.* at *2. It did not adopt a pipeline retroactivity view, instead holding that "[n]ew legal principles, even when applied retroactively, do not apply to cases already closed." *Id.* (quoting *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 758 (1995)); *see Stephanatos v. Wayne Twp.*, No. CV 12-1793, 2023 WL 5605564, at *2 (D.N.J. Aug. 30, 2023) ("This matter, however, has been closed for almost a decade."). The court also held that the claim was barred by *res judicata*. 2024 WL 1757061, at *2.

Thus, the problem in *Stephanatos* (among many others) was that the case had been closed for a decade and the plaintiff's claim was barred by *res judicata*. The court was not purporting to create a new retroactivity doctrine that departs from

10

*Harper*. Here, by contrast, the Plaintiffs' § 1983 claims are not in a closed case, but in a timely case brought after *Tyler*. The Takings Clause and *Tyler* apply to the underlying events. The Defendants do not argue that the statute of limitations has run on these claims, or that they are barred by *res judicata*.

In sum, *Tyler*'s rule applies even as to events that predated its announcement. Even if *Tyler* had never been decided, the Plaintiffs' complaint would state takings claims. *Tyler* simply confirms the strength of those claims beyond doubt. And the Plaintiffs have also stated claims under the federal and state Excessive Fines Clauses, which neither the majority's opinion in *Tyler* nor the Defendants here address. *See Tyler*, 598 U.S. at 647–48.[2]

## II. The government's transfer of the Plaintiffs' property to third parties—without providing just compensation—is unlawful.

Turning to the merits, the Plaintiffs' takings claims are straightforward. The government transferred properties from the Plaintiffs that were worth far more than any taxes owed and failed to provide just compensation in the form of the surplus value. As *Tyler* explained, though a municipality has "the power to sell [the plaintiff's] home to recover the unpaid property taxes," it cannot "use the toehold of the tax debt to confiscate more property than was due." *Tyler*, 598 U.S. at 639. The Defendants' main argument against the Plaintiffs' takings claims is that a two-step

---

[2] The Defendants do not seem to challenge the Plaintiffs' excessive fines claims at this stage. Those claims are sufficiently pled and based on facts in the record and law on the books, and are further supported by Justice Gorsuch's concurring opinion in *Tyler*, 598 U.S. at 648–50, and subsequent decisions like *Sharritt*, 2024 WL 4524501, at *14–15.

scheme involving a foreclosure by a private entity based on a tax sale certificate and a right to foreclose conveyed by the government is constitutionally different. That is wrong. All that matters is that the Defendants failed to provide just compensation after they effectuated a property transfer from one private owner to another.

Before addressing the Defendants' argument about transfers to private entities, it is worth noting that the Defendants concede that at least one Plaintiff—and presumably many putative class members—were foreclosed by government entities, so the complaint could not be dismissed on this ground. *See* Memo. 9 n.4.

### A.    Transfers of property by the government to other private owners are takings.

The Defendants' argument about transfers to private entities misunderstands the unlawful taking underlying the Plaintiffs' claims. The taking arises from the Defendants' failure to provide constitutionally mandated just compensation for taking property worth more than the Plaintiffs' tax debt. *See* Am. Compl. ¶ 109 ("Defendants did not provide or offer just compensation before, during, or after taking the property of Plaintiffs and the Plaintiff Class."); *id.* ¶¶ 111, 152. As courts have recognized in similar cases, the fact that a "tax sale system is essentially a mechanism for the [municipalities] to 'transfer property from one private party to another'" does not immunize municipalities from liability under the Takings Clause. *Sharritt*, 2024 WL 4524501, at *11 (quoting *Kelo v. City of New London*, 545 U.S. 469, 477 (2005)).

Governmental transfers from one private party to another for purported public use are paradigmatic takings, and the fact that it is a transfer rather than a retention

by the government is constitutionally irrelevant. *See Kelo*, 545 U.S. at 477, 489. In the context of takings, the Supreme Court has rejected any "requir[ement] that government possess and use property at some point during a taking." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 243 (1984). And the Supreme Court in *Tyler* reiterated "the principle that a taxpayer is entitled to the surplus in excess of the debt owed" when the government seeks to use its power over taxpayers' property to enforce tax debts. 598 U.S. at 642. Thus, municipalities' "attempt to pass the buck to the tax buyers is a red herring because the Fifth Amendment does not care whether the government or a private party receives the windfall; what matters is that it is unconstitutionally coming out of the original owner's pocket." *Sharritt*, 2024 WL 4524501, at *11.

Put another way, what matters is that the Plaintiffs' injury—the lack of just compensation for the surplus value—arose from a government-engineered taking. Private foreclosers were only able to receive their properties because *the government took them from the Plaintiffs and gave them to the foreclosers*. As the Defendants' primary authority explains, under New Jersey law, "[a] third-party tax sale certificate holder purchases the certificate as 'a lien on the premises' conveyed from 'the lien interest of the taxing authority.'" *Roberto*, 307 A.3d at 34 (quoting *Princeton Off. Park, LP v. Plymouth Park Tax Servs., LLC*, 93 A.3d 332, 340–41 (N.J. 2014)). "[T]he tax authority cannot confer greater rights to a third-party purchaser than those it retains." *Id.* at 35. Along with the certificate, the government also provides a right to foreclose on the property. N.J. Stat. Ann. §§ 54:5-86, -87; *see id.* §§ 54:5-104.32, 32a. Thus, *Tyler*'s "constitutional application stands whether the tax sale certificate

13

holder is the taxing authority, or a third-party purchaser proceeding with an interest conveyed by the taxing authority." *Roberto*, 307 A.3d at 34. No matter the precise "mechanics" of the taking process, *Midkiff*, 467 U.S. at 243, the Defendants have acted unlawfully by failing to provide just compensation after they transferred the Plaintiffs' property to another private entity.

The conclusion that the Plaintiffs allege a taking is even easier under the New Jersey Constitution. The state Constitution provides that "private corporations shall not be authorized to take private property for public use without just compensation." N.J. Const. art. I, ¶ 20. So even on the Defendants' characterization of their actions, they are liable. Under both the federal and state Constitutions, the Plaintiffs allege unlawful takings without just compensation.

### B.    Precedent supports the Plaintiffs' taking claims.

Courts elsewhere have reached similar conclusions about similar statutory schemes involving private tax sale foreclosures in *Tyler*'s wake. As discussed above and as the Defendants concede, the Supreme Court remanded two such cases for reconsideration in light of *Tyler*. *See* Memo. 9 & n.5. In those cases, the Nebraska Supreme Court had ruled before *Tyler* that "a former owner of property who lost title to his or her home through issuance of a tax deed" to a private entity did not have "a right to the difference between the value of the property and his or her tax debt." *Cont'l Res. v. Fair*, 10 N.W.3d 510, 518 (Neb. 2024). On remand after *Tyler*, the Nebraska Supreme Court said that "[o]ur reasoning in our initial opinion is plainly

out of step with *Tyler*" and held that the plaintiff "had a protected property interest to the extent the value of his property exceeded his tax debt." *Id.* at 518, 520.[3]

A recent decision by the Northern District of Illinois also rejected an argument identical to the Defendants', explaining that because "Plaintiffs ultimately render the entire value of their properties [to the municipality], who in turn renders it [to a buyer]," this "constitutes a taking for which the Fifth Amendment demands compensation for anything greater than what Plaintiffs owed to the [municipalities] in overdue property taxes." *Sharritt*, 2024 WL 4524501, at *11 (citation omitted) (citing *Kelo*, 545 U.S. at 477). As noted, the court agreed with the plaintiffs that "Defendants' attempt to pass the buck to the tax buyers is a red herring": the "core theory" is that "the lack of just compensation following the loss of their properties" violates the constitutional command for "the government to provide just compensation for any taking of property." *Id.* at *6, 11.

Courts considering Michigan's analogous statutory scheme have also rejected arguments like the Defendants'. In a decision favorably cited by the Supreme Court in *Tyler*, the Sixth Circuit rejected the argument that "a homeowner's equitable

---

[3] Though the Nebraska court went on to identify the private foreclicer as the liable party, *Fair*, 10 N.W.3d at 520–25, the constitutional prohibitions on takings apply against the government—and it is *the government's* responsibility to provide just compensation when it takes private property. Thus, the Defendants are appropriately liable. *See id.* at 527 (Papik, J., concurring in part and dissenting in part) (explaining that the municipal defendants should be liable because they "used the toehold of a tax debt to confiscate the entirety of [the plaintiff's] interests in his property," and "just took the additional step of transferring the property in excess of the tax debt to someone else").

interest in her property is limited to any 'surplus' proceeds after a foreclosure sale conducted by the 'foreclosing governmental unit.'" *Hall v. Meisner*, 51 F.4th 185, 195 (6th Cir. 2022); *see Tyler*, 598 U.S. at 638. The Sixth Circuit identified the *county* as the relevant entity that had "effected a taking of the plaintiffs' property": before "the County's taking of 'absolute title' to the plaintiffs' homes," "the plaintiffs held equitable title; after it, they held no title at all." *Id.* at 196. The same is true here. And just as the Michigan Court of Appeals said about the statutory scheme in that state, "the lack of surplus proceeds can hardly be described as not a taking—plaintiffs still lost their equitable title in their properties." *Jackson v. Southfield Neighborhood Revitalization Initiative*, No. 361397, 2023 WL 6164992, at *16 (Mich. Ct. App. Sept. 21, 2023). The Defendants are liable for that taking because they transferred the property without providing just compensation.

Even the State of New Jersey understood as much. While the Supreme Court was considering *Tyler*, New Jersey filed an amicus brief warning that ruling for Ms. Tyler would "render[] large swaths of statutory regimes vulnerable to a constitutional challenge."[4] The Tax Collectors & Treasurers Association of New Jersey likewise told the Supreme Court that ruling for Ms. Tyler would "mak[e] a large number of the states' tax collection statutes unconstitutional."[5]

After *Tyler*, the New Jersey Supreme Court suspended foreclosure judgments in cases like this. Am. Compl. ¶ 48. As the Chief Justice's Working Group

---

[4] Brief of *Amici Curiae* New Jersey et al. 1, *Tyler*, No. 22-166, 2023 WL 2825133 (Apr. 4, 2023).

[5] Brief of *Amici Curiae* Tax Collectors & Treasurers Association of New Jersey et al. 4, *Tyler*, No. 22-166, 2023 WL 2816046 (Mar. 31, 2023).

explained, "[l]ike the Minnesota process" in *Tyler*, New Jersey laws "permit a municipality or a private investor to obtain title to a property subject to unpaid taxes without a public sale and without any process for the property owner to retain the surplus equity beyond the amount of unpaid taxes." *Id.* ¶ 51. And the official statement accompanying the legislative fix passed by the New Jersey General Assembly said that a new law was necessary "to bring [New Jersey] laws into compliance with the recent United States Supreme Court decision in *Tyler*." *Id.* ¶ 60.

Presumably all this is why the Defendants cite no case adopting their theory that the government is immunized from takings liability when it transfers property from one private party to another without providing just compensation. Their only supportive citation is (again) to an unpublished denial of reconsideration in a *pro se* case that had been closed for over a decade, which merely noted in dicta—as a tertiary reason to deny reconsideration—that "the facts" of a private foreclosure sale were "distinguishable"—without suggesting that those distinctions would be legally dispositive in a properly-presented claim. *Stephanatos*, 2024 WL 1757061, at *3. As the Defendants appear to acknowledge, their only other citation is to a case that refutes their argument. *Roberto*, 307 A.3d at 34; *see* Memo. 10. Thus, the Defendants provide no reasoned precedent supporting their theory.

### C.    The Defendants' theory would undermine protections against takings.

Beyond the lack of precedent and reason, the consequences of the Defendants' theory confirm its unsoundness. That theory would let governments avoid the Takings Clause by simply inserting a private entity somewhere in its takings chain.

17

Here, for instance, the Defendants believe that they are off the hook merely because they have created and sold a property interest to a private entity, along with a right to foreclose—accomplishing a transfer from one private party to another. If that were enough to avoid the Takings Clause, the Clause would mean very little. "The Constitution deals with substance, not shadows," *Cummings v. Missouri*, 71 U.S. 277, 325 (1866), and "[i]t would be anomalous to permit the Government to do indirectly what it is forbidden to do directly." *In re Grand Jury Matter*, 673 F.2d 688, 693 n.11 (3d Cir. 1982); *see Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010) (plurality op.) ("[T]hough the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing.").

As the Supreme Court admonished in *Tyler*, a state cannot "sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate." 598 U.S. at 631. That the final elimination of the Plaintiffs' property interests happened after a judicial foreclosure is irrelevant: the federal "Takings Clause bars *the State* from taking private property without paying for it, no matter which branch is the instrument of the taking." *Stop the Beach*, 560 U.S. at 715 (plurality op.); *see id.* at 714 ("It would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat."). Under both the federal and state Constitutions, "[r]egardless of the exact method employed, where a taking occurs, the Takings Clause requires the government to compensate the property owner." *Klumpp v. Borough of Avalon*, 997 A.2d 967, 976 (N.J. 2010).

18

In passing, the Defendants say that they "should not be called upon to compensate Plaintiffs for their alleged losses." Memo. 10. But that argument simply assumes its conclusion: if the Defendants failed to provide just compensation for surplus value after a taking, as the Plaintiffs allege and as *Tyler* supports, then they are *required* by both the federal and New Jersey Constitutions to provide just compensation. U.S. Const. amend. V; N.J. Const. art. I, ¶ 20.[6] Whether the government retained any surplus is irrelevant: "the question is what has the owner lost, not what has the taker gained." *City of Monterey*, 526 U.S. at 710. And as discussed more below, it was *not* "the private foreclosing entities that took all the necessary and discretionary steps to prosecute the foreclosure." Memo. 10. The Defendants not only chose to create a property interest and sell the private entities that interest, but—most importantly—they declined to provide compensation for the surplus value. Under both the federal and state Constitutions, that makes the municipal Defendants liable to pay just compensation.

**D.    The defendant municipalities are liable for failing to pay just compensation.**

Last and relatedly, the Defendants argue that they "should not be held responsible" because they were "acting in compliance with state law." Memo. 11; *see* Hazlet Memo. 5–9 (similar). This argument fails, for at least four reasons.

---

[6] Whatever the scope of this argument by the Defendants, it could not apply to the Plaintiffs' taking claim under the New Jersey Constitution, given that its Takings Clause prohibits authorizing private entities "to take private property for public use without just compensation." N.J. Const. art. I, ¶ 20; *contra* Memo. 10.

*First*, the Defendants do not articulate the legal basis of their argument or explain which claims that argument applies to. *See* Memo. 11–12; Hazlet Memo. 5–9. The Defendants' vague assertion that "finding liability against a municipal entity" "would be inappropriate" (Memo. 12) might relate to any number of unexplained (and uncited) legal doctrines—some jurisdictional, others related to stating a claim, and still others about affirmative defenses—and the Plaintiffs lack sufficient notice of this argument to respond appropriately. *See* Fed. R. Civ. P. 7(b)(1)(B) (requiring that motions "state with particularity the grounds for seeking the order").

*Second*, the Defendants' argument would not apply to plaintiffs like Kyle Gray, since the Defendants do not argue that municipalities who hold tax sale certificates are required to foreclose. *See* N.J. Stat. Ann. § 54:5-104.32 (explaining that "[a]ny municipality . . . *may* proceed" with foreclosure (emphasis added)); *see also* Memo. 9 n.4 (conceding that Paulsboro took Gray's property directly).

*Third*, as the Northern District of Illinois recently explained in rejecting a similar argument underlying a similar statutory scheme, the Plaintiffs "are not suing the officials for any act they performed that state law compelled them to do." *Sharritt*, 2024 WL 4524501, at *5. Rather, they are alleging liability for actions that the municipalities "fail[ed] to take," including "rendering just compensation to Plaintiffs for [surplus] equity they owned in their properties." *Id.*; *see Woodbridge v. City of Greenfield*, No. CV 23-30093-TSH, 2024 WL 2785052, at *5 (D. Mass. May 29, 2024) (agreeing with other courts that "have 'rejected the notion that a municipal defendant can claim reliance on existing state law to shield itself from § 1983 claims premised on the retention of a taxpayer's surplus equity,'" and

emphasizing the allegation that the city "had a policy" of "retain[ing] the excess proceeds/value").

The Defendants point to nothing in state law that precluded them from providing just compensation, and the Plaintiffs allege that "[i]t is the policy, custom and practice of the Defendants and the Defendant Class to authorize and execute takings without requiring or themselves returning the surplus proceeds or value to the Plaintiffs and Plaintiff Class." Am. Compl. ¶ 110. Thus, the Plaintiffs have alleged unlawful acts by the Defendants.

*Fourth*, as the Northern District of New York explained in also rejecting a similar argument at the motion-to-dismiss stage, even setting aside the absence of just compensation, "it is not clear at this early stage of the case whether [New Jersey's] tax foreclosure scheme vests" "discretion in the taxing authority or, relatedly, whether the [municipality] implemented the tax foreclosure scheme in some kind of a voluntary manner." *Polizzi*, 720 F. Supp. 3d, at 148–49. "[E]ven if it turned out that [New Jersey's] foreclosure scheme was in fact a mandatory one, that would not necessarily compel the conclusion that the [Defendants'] alleged conduct was constitutional, either." *Id.* at 149. "For one thing, the issue that matters more than the text of some state tax statute is how the [municipality] actually implemented the foreclosure scheme on which it has purportedly relied in selling of plaintiffs' parcels." *Id.* New Jersey law suggests some variability in this implementation, and the Defendants have provided no basis for the Court to decide this question as a matter of law at the motion-to-dismiss stage. *See, e.g.*, N.J. Stat. Ann. § 54:5-37 ("the

failure of a municipal officer to enforce a municipal lien within that time shall not impair the lien").

Again, the Defendants' generalized argument about their compliance with state law may fail for additional reasons, but without any explanation of the legal basis for that argument, the Plaintiffs are limited in their ability to respond.[7] The Defendants' limited and vague argument about compliance with state law fails.

## III. Paulsboro's recasting of its takings argument as about standing fails because taking of surplus equity is an injury.

As noted, the above argument by the Defendants about private entity transfers could not apply to Plaintiff Gray's claim against Paulsboro, since Paulsboro gave itself the title to Gray's property. *See* Memo. 9 n.4. Yet Paulsboro offers a similar spin on the same argument, insisting that Gray "does not have standing because no surplus value was received by Paulsboro." Paulsboro Memo. 3. That is the case, according to Paulsboro, because some five years after it took Gray's property— including its surplus equity—it chose to sell the property at a low price to a third

---

[7] "[A] passing reference to an issue in an opening brief will not suffice to put a party on notice that the moving party is moving on that particular issue," and "[n]ew arguments cannot be raised in a reply brief." *Halpern v. Centroid Systems, Inc.*, No. 2:24-CV-07037, 2024 WL 4533370, at *3 (D.N.J. Oct. 21, 2024) (cleaned up). Regardless, any argument based on supposed good faith would fail for multiple reasons, including that "the good-faith defense offered by the Supreme Court's qualified immunity doctrine is not available to municipalities," "courts have already rejected the notion that a municipal defendant can claim reliance on existing state law to shield itself from § 1983 claims premised on the retention of a taxpayer's surplus equity," *Polizzi*, 720 F. Supp. 3d, at 148, and any argument about good-faith execution "is not ripe for adjudication at the motion to dismiss stage." *Sharritt*, 2024 WL 4524501, at *13.

party. This argument fails for many reasons, most obviously (and again) because "the question is what has the owner lost, not what has the taker gained." *City of Monterey*, 526 U.S. at 710.

Some initial clarification is in order, since Paulsboro's memorandum obscures the details of its foreclosure of Plaintiff Gray's property and subsequent sale. Paulsboro's exhibits show that it conducted a tax certificate sale for Gray's property on October 11, 2016, and retained the certificate for itself. ECF No. 45-2, at 5. Around the end of April 2018, Paulsboro passed a resolution to foreclose on the property. *Id.* at 4. At that time, Gray owed $10,643.46. *Id.* at 5. Foreclosure was ordered by default judgment on June 19, 2019. *Id.* at 11. At that time, the property's fair market value was $106,508. Am. Compl. ¶ 37. Gray lost "over $90,000" in surplus value. *Id.* Nearly five years later, for reasons unsaid by Paulsboro, it chose to sell the property for $11,000 to a third party. ECF No. 45-2, at 14.

That brings us back to Paulsboro's standing argument, which is that because "Plaintiff Gray's claims depend on the notion that Paulsboro received surplus value on the sale," and Paulsboro purportedly did not, Gray lacks standing. Paulsboro Memo. 3. But Gray's claims do not depend at all on what Paulsboro did with the property five years after it took it. It wouldn't even matter what Paulsboro did with the property five minutes after it took it, as long as Gray could plead and prove that the fair market value exceeded whatever he owed. His complaint, taken as true, pleads exactly that. Am. Compl. ¶ 37. Paulsboro does not contest that allegation, and for purposes of standing at the motion-to-dismiss stage, the plaintiff is presumed to succeed on his claims. *See Arizona State Legislature v. Arizona Indep. Redistricting*

*Comm'n*, 576 U.S. 787, 800 (2015) ("[O]ne must not confuse weakness on the merits with absence of Article III standing," for standing "in no way depends on the merits of the claim." (cleaned up)). So, like the plaintiff in *Tyler* who was held to have standing, Gray too alleges "a classic pocketbook injury sufficient to give h[im] standing." *Tyler*, 598 U.S. at 636. "At this initial stage of the case, [the plaintiff] need not definitively prove h[is] injury," and he "has plausibly pleaded on the face of h[is] complaint that []he suffered financial harm from [Paulsboro's] action, and that is enough for now." *Id.* at 637.

As noted above, arguments like Paulsboro's about whether the government *actually* obtained a surplus have been routinely rejected even when presented as merits questions rather than standing ones. Again, any "lack of surplus proceeds can hardly be described as not a taking—plaintiffs still lost their equitable title in their properties." *Jackson*, 2023 WL 6164992, at *16. The Defendants inflicted that injury on the Plaintiffs—including Paulsboro on Plaintiff Gray—and are liable for it because they effectuated a taking without providing just compensation.

What the Defendants did with the properties after they took them is irrelevant, both to standing and the merits. (No question of "public use" under the Fifth Amendment is presented, at least at this stage.) Paulsboro itself notes potential reasons it may have had to sell the property for a below-market value, including "to return the properties to the tax rolls as soon as possible." Paulsboro Memo. 6 (describing this as "[t]he primary objective of all New Jersey municipalities," albeit without explaining how waiting five years to sell Gray's property is consistent with this objective). Regardless, a municipality's own choices about how to dispose of

24

taken properties or its decision to sell them at a price significantly below their fair market value are irrelevant to the Plaintiffs' takings claims. The Plaintiffs have standing and have stated takings claims for the lack of just compensation.

## IV.    Plaintiff Gray states an inverse condemnation claim.

Paulsboro alone contends that Plaintiff Gray fails to state an inverse condemnation claim because he alleges a "*de jure*, not *de facto*" taking. Paulsboro Memo. 6. But as Paulsboro concedes, "inverse condemnation is simply a form of takings claim," *id.* at 6–7, and as explained above, the Plaintiffs state takings claims. *See Greenway Dev. Co. v. Borough of Paramus*, 750 A.2d 764, 770 (N.J. 2000) (explaining that "inverse condemnation claims . . . allege, in a state court proceeding, a violation of the Just Compensation Clause of the Fifth Amendment").

The whole point of inverse condemnation is that "that the landowner may initiate the action to compel compensation from government; one need not wait in vain for government compensation." *Klumpp v. Borough of Avalon*, 997 A.2d 967, 976 (N.J. 2010). A plaintiff's inverse condemnation claim cannot be barred simply because the government repeats its incorrect characterization of its actions as merely "collecting taxes" or achieving some other goal. Paulsboro Memo. 6.

Here, the Plaintiffs allege a "*de facto*" taking: after permissibly "collecting taxes," *id.*, the municipalities went on to impermissibly take surplus equity without following New Jersey's Eminent Domain Act or providing compensation. N.J. Stat. Ann. §§ 20:3-1 to -50; *see* Am. Compl. ¶ 125. And once "the government seizes property without first bringing a condemnation proceeding," an individual may "bring an action to compel condemnation, known as 'inverse condemnation.'"

*Klumpp*, 997 A.2d at 976; *see Rieder v. State Dep't of Transp.*, 535 A.2d 512, 515 (N.J. Super. App. Div. 1987) (explaining that "[i]nverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted" (internal quotation marks omitted)).

Paulsboro cites no precedent supporting its apparent position that whenever the government argues that some statute permits its taking of property, then the plaintiff can no longer state a cause of action for inverse condemnation. Indeed, it is the rare government entity that would not invoke *some* statutory excuse for its taking, so Paulsboro's argument would seemingly bar nearly all inverse condemnation claims. Paulsboro's argument would imply that a state could permit municipalities to routinely take property without just compensation, as such takings would then be "*de jure*," and according to Paulsboro, not subject to inverse condemnation. In any event, Paulsboro cites nothing suggesting that inverse condemnation applies only to some subset of takings claims.

The thrust of the Plaintiffs' claims here is that though Paulsboro and the other defendants say they were merely conducting tax enforcement, their transfer or retention of surplus equity beyond unpaid taxes is an unconstitutional taking. Thus, the Plaintiffs properly allege an inverse condemnation claim.[8]

---

[8] Paulsboro's half-sentence retroactivity argument on inverse condemnation (Paulsboro Memo. 7) fails for the reasons addressed in Part I, *supra*.

26

**V.    Plaintiff Sherrod-Polan did not waive her claims here.**

Next, the Defendants argue that Plaintiff Sherrod-Polan "waived her right to contest or challenge the final judgement" of foreclosure by signing an agreement with "the private foreclosing party." Memo. 13–14. But agreeing not to contest a foreclosure judgment for a private party is not the same thing as consenting to a taking without just compensation by the government. "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). "[C]ourts indulge in every reasonable presumption against waiver of fundamental constitutional rights," and they "do not presume acquiescence in the loss of fundamental rights." *United States v. Brown*, 849 F.3d 87, 91 n.7 (3d Cir. 2017) (quoting *McMahon v. Fulcomer*, 821 F.2d 934, 944 (3d Cir. 1987)). Particularly given this high standard, the Defendants' assertion that Ms. Sherrod-Polan knowingly consented not only to the foreclosure but also to an otherwise unconstitutional taking fails.

Trying to fit the terms of the agreement—which focus on "contest[ing] the final judgment" (Memo. 13)—into the facts of this case, the Defendants raise "three legal frames of analysis—contract, quasi-estoppel, and mootness." Memo. 13. Each fails.

Starting with the last, the Defendants' mootness argument lacks merit. Sherrod-Polan is not bringing "a belated challenge to a final judgment in which she acquiesced" or trying to reclaim title to her property from the private forecloser, NR Deed. Memo. 15. Rather, she seeks just compensation from the government for the

excess value of the property—the value taken over the tax revenue she owed. She is not contesting that the government had the right to transfer her property right via foreclosure; she is simply arguing that it must fulfill its constitutional obligation to pay for the surplus value, just as *Tyler* confirmed. And this case is not moot, because the Court can require the Defendants to pay the required just compensation (or otherwise redress her injuries).

Second, the Defendants argue that Ms. Sherrod-Polan's claim is barred based on the agreement under the doctrine of quasi-estoppel. According to the Defendants, the doctrine of quasi-estoppel "applies where it would be unconscionable to permit a person to maintain a position inconsistent with one in which she acquiesced or where she had accepted a benefit." Memo. 14. But there is no inconsistency here. Beyond the fact that the agreement was between Sherrod-Polan and the private forecloser—not the Defendants—Sherrod-Polan does not seek to vacate the final judgment ordering the foreclosure. She just wants her constitutional rights vindicated by adequate compensation. This claim is consistent with what she agreed to with the private forecloser.

Last, the Defendants' contract claim fails from the get-go because the Defendants were not a party to the agreement. Under New Jersey law, absent an "intent to recognize the third party's right to contract performance," the third party "ha[s] no contractual standing." *Labega v. Joshi*, 270 A.3d 378, 386 (N.J. Super. App. Div. 2022) (quoting *Ross v. Lowitz*, 120 A.3d 178 (N.J. 2015)); *see Zydus Worldwide DMCC v. Teva API Inc.*, 461 F. Supp. 3d 119, 133 (D.N.J. 2020) (same).

The Defendants point to no contractual intent to recognize any rights stemming from the agreement for their benefit, so they lack standing to enforce the contract.

A contractual argument would fail anyway. In the agreement, Sherrod-Polan said that if she "fail[ed] to redeem the Tax Sale Certificate and make the Settlement Payment to NR Deed on or before the Settlement Payment Deadline," "NR Deed shall be entitled to obtain Writ of Possession and possession of the Property" and she would not challenge that final judgment. ECF No. 29-2, at 61. She also agreed that if she failed to redeem, she would "have no further rights and/or interests in and to the Property." *Id.* That simply restates what happens in every foreclosure—the foreclosed party loses its rights in the property afterward. *See Roberto*, 307 A.3d at 31 ("If the property owner does not timely redeem, final judgment bars 'the right of redemption, and . . . foreclose[s] all prior or subsequent . . . encumbrances.'") (quoting New Jersey Stat. Ann. § 54:5-104.64(a)). And where that action *also* involves an uncompensated taking by the government, the party maintains its constitutional right to redress; otherwise (and contrary to *Tyler*), no compensation would ever be required after foreclosure. And again, Sherrod-Polan does not here contest or seek to undo the foreclosure. At a minimum, applying "every reasonable presumption against waiver of fundamental constitutional rights" requires reading the agreement not to free the Defendants from their constitutional obligations with respect to Ms. Sherrod-Polan. *Brown*, 849 F.3d at 91.

In sum, Plaintiff Sherrod-Polan's agreement with the private foreclose does not bar her claims against the Defendants here.

## VI.    Plaintiff Knight-Capes has withdrawn her claim.

The Defendants point out that Plaintiff Knight-Capes's property was in the Township of Hamilton rather than the City of Trenton, and argue that "Plaintiffs have failed to name Hamilton Township as a Defendant." Memo. 15–16. While the Plaintiffs agree that Knight-Capes's property is in Hamilton (the confusion having arisen because the U.S. Postal Service classifies the address as Trenton[9]), the issue is now moot because Ms. Knight-Capes has filed a voluntary dismissal of her case for reasons unrelated to this lawsuit.

## VII.    Dismissal without prejudice is appropriate for Counts IV, V, and VI.

The Plaintiffs do not contest the dismissal of the conversion, unjust enrichment, and money had and received claims, Counts IV through VI, based on sovereign immunity, the New Jersey Tort Claims Act (TCA), and the New Jersey Contractual Liability Act. That dismissal, however, should not be with prejudice. Sovereign immunity implicates the Court's jurisdiction, and a court without jurisdiction generally cannot dismiss an action with prejudice. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d Cir. 1996); *Talley v. Pennsylvania Dep't of Corr.*, No. CV 19-1589-KSM, 2024 WL 1253626, at *15 n.28 (E.D. Pa. Mar. 21, 2024) (collecting cases); *accord* Memo. 17 (arguing that the Court "*lack[s] jurisdiction*" (emphasis in original)).

Some Defendants contend that Count III, a claim for inverse condemnation, must also be dismissed under the New Jersey TCA, Memo. 16, but that is wrong. As

---

[9] *See* Hamilton Township, Frequently Asked Questions, https://perma.cc/JX45-MMRG.

their co-Defendant Paulsboro explains, "[t]he Supreme Court of New Jersey has ruled that inverse condemnation claims (Count III) are not an 'injury' within the meaning of the TCA and thus are not subject to the TCA's notice provision." Paulsboro Memo. 8 n.2; *see Greenway*, 750 A.2d at 770 ("We hold that inverse condemnation is not a tort or an 'injury' within the meaning of the TCA, for which the notice of claim provision is applicable. An inverse condemnation action should proceed unencumbered by the TCA.").

## VIII. The individual Defendants are appropriately liable in their official capacities.

Last, the Defendants argue that the complaint does not sufficiently "establish each individual defendant's liability." Memo. 20. But the Defendants do not contest that the complaint alleges liability against each municipality, nor do they contest that each individual defendant is the proper official-capacity defendant for each respective municipality in terms of the acts alleged to be unlawful. As the Defendants concede, "an official-capacity suit is 'only another way of pleading an action against an entity of which an officer is an agent.'" Memo. 20 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). The Defendants omit from their quotation that it is sufficient for official-capacity suits that "the government entity receives notice and an opportunity to respond," *Graham*, 473 at 166, so their complaint about "notice" (Memo. 20) to the individual Defendants lacks merit.

Regardless, given that the Defendants do not invoke sovereign immunity or any similar defense as to the constitutional claims (Counts I, II, VII, and VIII) or inverse condemnation (Count III)—and they have no such defenses—it is irrelevant

whether the official capacity defendants remain in the case. Each municipal defendant is fully liable for the unlawful acts alleged. Though generally "Rule 12(b)(6) is not an appropriate vehicle for dismissal of redundant or duplicative claims," *Corlew v. Borough*, No. 3:22-CV-01990, 2024 WL 1051980, at *3 (M.D. Pa. Mar. 11, 2024); *see Shapiro v. Aetna, Inc.*, No. 22-CV-1958-ES-AME, 2023 WL 4348601, at *5 (D.N.J. June 5, 2023), the Plaintiffs have no objection to dismissing the official-capacity individual Defendants if the municipal Defendants do not contest their general liability for the acts alleged.[10]

## CONCLUSION

The Court should deny the motion to dismiss as to the Plaintiffs' takings, excessive fines, and inverse condemnation claims (Counts I, II, III, VII, and VIII) against the municipal Defendants. Dismissal without prejudice is appropriate for the Plaintiffs' tort and unjust enrichment claims (Counts IV through VI) based on the Defendants' invocation of sovereign immunity and New Jersey's tort claims notice rule.

---

[10] The individual Defendants were originally included for injunctive relief against the former state statute. The former statute law now repealed, so injunctive relief is no longer possible. *See Nextel Ptnrs. Inc., v. Kingston Twp.*, 286 F.3d 687, 693 (3d Cir. 2002); *accord County of Morris v. Nationalist Movement*, 273 F.3d 527, 534 n.4 (3d Cir. 2001). However, damages relief against the municipalities is still possible based on their acts under the former statute. *See 8 Erie St. JC LLC v. City of Jersey City*, No. 19-CV-9351, 2020 WL 2611540, at *2 (D.N.J. May 21, 2020).

Dated: January 7, 2025

Respectfully submitted,

Daniel R. Suhr*                                    s/Mark R. Scirocco
Hughes & Suhr LLC                              Mark R. Scirocco/061192013
747 N. LaSalle St., Suite 210              Scirocco Law, P.C.
Chicago, IL 60654                              143 Washington Street
414-588-1658                                    Morristown, NJ 07960
dsuhr@hughesandsuhr.com              973-691-1188
                                                         Fax: 973-691-3353
Christopher Mills*                            mark@sciroccoesq.com
Spero Law LLC
557 East Bay Street #22251
Charleston, SC 29413
843-606-0640
cmills@spero.law

*Pro hac vice motion pending

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Trenton Vicinage

| | |
|---|---|
| **Dorothy M. Thompson, Barry Seward, Trude Sherrod-Polan, Karin Knight-Capes, and Kyle Gray**, *on behalf of themselves and all others similarly situated*, | |
| Plaintiffs, | Case Number: 24-cv-6295 |
| *v.* | |
| **Constance Ludden, the City of Trenton, Rachel Hundley, the Township of Hazlet, Susan E. McCloskey, the Township of Lawrence, Mackenzi Kelly, and the Borough of Paulsboro,** *on behalf of themselves and all others similarly situated*, | **CERTIFICATE OF SERVICE** |
| Defendants. | |

I, Mark R. Scirocco, counsel for Plaintiffs, do certify that on January 7, 2025, I electronically filed the accompanying opposition with the Court via the ECF system, which I understand to have caused electronic service on any party that has appeared in this matter. In the event that a party appears after the electronic filing of this motion, a copy of same will be promptly served upon that party upon their appearance.

*/s/ Mark R. Scirocco*
Mark R. Scirocco, Esq.